375 A.2d 354

**COMMONWEALTH of Pennsylvania**

v.

**James M. BENDER, Appellant.**

Superior Court of Pennsylvania.

Argued April 13, 1977.

Decided June 29, 1977.

Jonathan W. Delano, Pittsburgh, with him Reed, Smith, Shaw & McClay, Pittsburgh, for appellant.

Joel M. Kaufman, Assistant District Attorney, Pittsburgh, with him Robert E. Colville, District Attorney, Pittsburgh, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE and SPAETH, JJ.

HOFFMAN, Judge:

Appellant contends that we must reverse his conviction of criminal harassment[1] and arrest the judgment of sentence because: (1) the Commonwealth did not produce sufficient evidence to prove appellant guilty of criminal harassment, (2) appellant's alleged criminal conduct at most constituted

1. The Crimes Code, Act of Dec. 6, 1972, P.L. 1482, No. 334, § 1, eff. June 6, 1973; 18 Pa.C.S. § 2709(3).

a *de minimis* infraction not warranting criminal sanctions,[2] and (3) his conviction abridges his constitutional rights to petition the government for redress of grievances and to speak freely. See U.S.Const. Amends. I, XIV; Pa.Const. Art. I, §§ 7, 20. We believe that the Commonwealth failed to produce sufficient evidence that appellant committed criminal harassment. Accordingly, we vacate appellant's judgment of sentence and order that appellant be discharged.

On October 2, 1975, two Pittsburgh police officers, Regis L. Diggans and Robert Smolensky, filed identical private criminal complaints against appellant. Each complaint alleged that appellant harassed the victim in violation of 18 Pa.C.S. § 2709, supra, by "making formal complaints against the victim at the Internal Affairs Div., City of Pittsburgh, Police Dept., at the Mayor's Service Center, without justification, and reason, the defendant also makes calls and persists in harassing the victim at the Public Safety Bldg., which did alarm and seriously annoy the said victim . . and which served no legitimate purpose." On October 20, 1975, a magistrate found appellant guilty of harassment and ordered appellant to pay $111 in fines and costs. Appellant paid this sum and exercised his right to a trial *de novo* before the Allegheny County Court of Common Pleas. Rule 67, Pa.R.Crim.P., 19 P.S. Appendix.

On February 12, 1976, the Commonwealth presented the following testimony at trial. On July 28, 1975, appellant went to the Gunner's Den, owned by Burton Bennett, in Pittsburgh and attempted to procure a Ruger .44 Magnum firearm. Appellant completed a standard permit application and forwarded it to the Gun Registration Section of the Pittsburgh Police Department. Upon receipt of the application, the section supervisor, Sergeant Regis L. Diggans, assigned Officer Robert Smolensky to handle the application. While processing this application, Officer Smolensky discovered that marijuana and theft charges were currently

2. The Crimes Code, supra; 18 Pa.C.S. § 312.

pending against appellant.[3]  In accordance with departmental regulations barring the issuance of a gun permit to persons with outstanding criminal charges, Officer Smolensky denied appellant's application and notified Burton Bennett of his action.  Bennett, in turn, informed appellant, observed that he was upset, as were most of his customers in similar situations, and suggested that appellant contact the police officers in the Gun Registration Section in order to ascertain why the department denied his application.  On or about July 30, appellant telephoned Officer Smolensky at the police station.  Officer Smolensky testified that he explained why he refused to issue a permit and suggested that if appellant really desired this particular gun, appellant could arrange to have a friend, without a criminal record of any kind apply for a permit and purchase the gun.  If the charges pending against him were dismissed, appellant could then apply for a transfer permit.  On August 1, a friend of appellant received a permit and purchased the desired firearm.

On August 25, 1975, the outstanding drug charges against appellant were dismissed.  Appellant immediately applied for a transfer permit.  On August 26, 1975, Officer Smolensky processed the transfer application and again discovered that drug and theft charges against appellant were still pending because the police department records had not yet been updated to reflect the dismissal of the drug charges or to correct the original error in listing the theft charge.  On the morning of August 27, Officer Smolensky informed Bennett that he would not issue a transfer permit, and Bennett so informed appellant.  On August 29, appellant telephoned Officer Smolensky at the police department to find out why his transfer application had been rejected.  Officer Smolensky responded that because of the outstanding drug and theft charges, he could not approve the application.  Appellant replied that all charges had been dismissed.  Officer Smolensky advised appellant to go to the

3.  The Commonwealth concedes that, in fact, the listing of the theft charge was erroneous.

Magistrate's Office in the Pittsburgh City Court and obtain a copy of the disposition of the charges. Later that afternoon, appellant returned to Officer Smolensky's office with an unsigned, undated piece of paper which read: "Charges Dismissed." Officer Smolensky declined to accept this paper as proof of the dismissal of the pending charges. When appellant stated that the clerk in the Magistrate's Office refused to give him a copy of the disposition papers, Officer Smolensky suggested that appellant return to the Magistrate's Office and ask a clerk to call Officer Smolensky to confirm the dismissal of the charges. Appellant followed this procedure, and Officer Smolensky issued the transfer permit. Officer Smolensky testified that appellant apologized to him and Sergeant Diggans for being disorderly, thanked them for their help, and left. According to another police department employee, appellant mumbled and appeared provoked as he passed her desk on his way out of Officer Smolensky's office.

In early September, 1975, appellant visited the Internal Affairs Division (hereinafter I.A.D.) of the Pittsburgh Police Department and spoke with Inspector James Campbell. Inspector Campbell testified that one of the functions of the I.A.D. was "to take complaints of deliberate or accidental misconduct on the part of officers." Appellant told Inspector Campbell that he believed that his application had been handled improperly and that Officers Diggans and Smolensky had insulted and abused him. Inspector Campbell advised appellant that the officers had fully complied with departmental procedures and that appellant's complaint was groundless because he ultimately received his gun permit. Appellant then left the I.A.D. office without filing a complaint.

On September 22, 1975, appellant lodged a complaint against Officers Diggans and Smolensky with the Pittsburgh Mayor's Service Center. The complaint alleged that the officers insulted him and improperly handled his application. An employee of the Mayor's Service Center testified that the Center was designed to take complaints concerning

the conduct of municipal employees. The Mayor's Service Center referred the complaint to the Superintendent of Police who instructed the two officers to file a written response to appellant's complaint. A Mayor's Service Center employee testified that the Center never notified appellant of the disposition of his complaint; appellant confirmed this testimony.

On September 29, 1975, appellant filed a 3 or 4 page complaint against the two officers with the I.A.D.; appellant asserted that the two officers had violated his constitutional rights and had insulted him. The two police officers were again instructed to file responsive reports. On September 30, appellant voluntarily withdrew his I.A.D. complaint.

On or about September 30, 1975, appellant contacted the Pennsylvania Human Relations Commission about his complaint. An employee of the Commission advised appellant to contact Officer Smolensky's Supervisor at the police department. On September 30, appellant telephoned Officer Smolensky's supervisor; appellant did not realize that Officer Smolensky's supervisor was, in fact, Sergeant Diggans. Appellant told the supervisor that Officer Smolensky and Diggans had insulted him many times and that they had mishandled his gun permit and transfer applications. At this point, Sergeant Diggans told appellant to whom he was speaking; appellant replied that he did not want to do anything to Sergeant Diggans, but that he wanted to maintain his complaint against Officer Smolensky. Sergeant Diggans, however, informed appellant that the two officers would see him in civil court. Sergeant Diggans stated that he "had one hell of a time getting off the phone from him. I thought I was talking to Orson Welles or somebody with a higher IQ than that." Sergeant Diggans also testified that appellant had telephoned him at the police station 3 or 4 times prior to September 30. Each conversation lasted 3 to 15 minutes; on one occasion, appellant allegedly talked "like a curbstone lawyer telling me the law."

Officer Smolensky testified that appellant's complaints upset him so much that they aggravated a pre-existing nervous condition, caused by a previous spinal injury, and made him sick for two days, September 30, and October 1. Officer Smolensky testified that he believed that his promotion prospects would be substantially impaired because his previously unblemished personnel file would now show that two complaints had been filed against him. Officer Smolensky conceded that the complaints in his file were marked "totally unfounded." Officer Smolensky also testified that he never insulted appellant, that he patiently explained the applicable procedures, and that he did everything he could to help appellant.

Sergeant Diggans testified that appellant aroused his "Irishman's ire" and disturbed him greatly because the complaints might endanger his professional reputation. He stated that he never insulted appellant and that he thoroughly explained the pertinent procedures to appellant.

Appellant testified that he believed that Officer Smolensky and Diggans had needlessly insulted him and mishandled his application. In particular, he stated that the officers told him that he had a bad attitude and that people with bad attitudes did not receive gun permits. Appellant also testified that he contacted 5 or 6 attorneys who informed him that the two police officers could not constitutionally refuse a permit unless appellant had been convicted of or indicted for a crime. Moreover, appellant believed that the police officers had "dreamed up" the theft charges to justify their refusal of a gun permit; appellant did not know that his record erroneously revealed an outstanding theft charge. Finally, appellant believed that the two police officers had unnecessarily forced him to run the bureaucratic gauntlet even after the dismissal of the marijuana charges. Appellant filed his complaints with the Mayor's Service Center and I.A.D. and contacted the Pennsylvania Human Relations Commission upon the advice of his attorneys. When he finally understood the procedures employed by the police officers and realized that the police officers did not know

that he had not been charged with theft, he dropped his I.A.D. complaint.

On February 13, 1976, the Court of Common Pleas of Allegheny County found appellant guilty and sentenced him to pay a fine of $100 plus costs. This appeal followed the lower court's denial of appellant's post-verdict motions.

■ Appellant first contends that the Commonwealth failed to adduce sufficient evidence that he committed criminal harassment. 18 Pa.C.S. § 2709, supra, provides, in pertinent part: "A person commits a summary offense when, with intent to harass, annoy or alarm another person: . . (3) he engages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose.[4] In determining whether the Commonwealth proved appellant guilty of criminal harassment beyond a reasonable doubt, we must, of course, view the trial testimony in the light most favorable to the Commonwealth. Moreover, we must accept as true all evidence, together with all reasonable inferences therefrom, upon which the lower court could properly have based its verdict. *Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687 (1977).

Our Court has construed 18 Pa.C.S. § 2709(3) on two separate occasions. In *Commonwealth v. Schnabel*, 236 Pa. Super. 280, 344 A.2d 896 (1975), appellant-lessor severed a hose which supplied water to a lessee's lot. We reversed defendant's conviction because the Commonwealth did not establish that appellant engaged in a "course of conduct" of harassment. *See also People v. Hotchkiss*, 59 Misc.2d 823, 300 N.Y.S.2d 405 (1969). We also noted that the legislature did not intend to punish defendant's conduct with criminal sanctions. We stated: "It is inevitable under modern social

4. 18 Pa.C.S. § 2709(3) is based upon *American Law Institute, Proposed Official Draft of the Model Penal Code*, § 250.4 (1962). *See also Commentary, Model Penal Code, Tentative Draft No. 13* at p. 52 (1960). 18 Pa.C.S. § 2709(3) is also identical to N.Y. Penal Law § 240.25(5) (McKinney 1967).

conditions that neighbors will become involved in minor disagreements. We do not believe that the Commonwealth has any real interest to vindicate by interfering in such minor annoyances. The evidence in this case portrays two people, living in proximity to each other, involved in any annoying disagreement to which almost everyone is subject at one time or another. The appellant's act of cutting his water hose, though possibly a wrongdoing, is not criminal. . . ." supra, 236 Pa.Super. at 284–85, 344 A.2d at 898. (footnote omitted).

In *Commonwealth v. Duncan*, 239 Pa.Super. 539, 363 A.2d 803 (1976), our Court affirmed defendant's criminal harassment conviction. The Commonwealth demonstrated that defendant entered a University of Pennsylvania dormitory lounge at 3:30 a. m., approached a coed sleeping on a couch, and, with his face in close proximity to her face, entreated her 3 or 4 times to allow him to perform cunnilingus, Judge Van der Voort, in a plurality opinion joined by President Judge Watkins and Judge Cercone, stated that: "In enacting 18 Pa.C.S. § 2709(3), our legislature did not intend to proscribe isolated acts which would be of only minor annoyance to the average person, or which are constitutionally protected. The statute requires a course of conduct or repeated acts which would seriously offend, we find, the average person; it requires the fact-finder to infer a specific intent on the part of the accused, and it specifies that the conduct must be of a non-legitimate nature—conduct which is not constitutionally protected." Supra 239 Pa.Super. at 549, 363 A.2d at 908. A Majority of the Court found that defendant possessed an intent to harass the coed which could be inferred from his words and actions when viewed in the light of all the attendant circumstances. Defendant's invitation to engage in lewd and illegal conduct was not a constitutionally protected manifestation of social or political beliefs or an attempt to engage in any "legitimate conduct." His repeated entreaties established a "course of conduct,"

and his pleas and actions seriously annoyed a person of average sensibilities.[5]

In the instant case, we believe that the Commonwealth failed to establish beyond a reasonable doubt the following three elements necessary to sustain a conviction under 18 Pa.C.S. § 2709(3): (1) intent to harass, annoy, or alarm another person, (2) conduct which has "no legitimate purpose," and (3) conduct which alarms or seriously annoys the average person. The Commonwealth contends that appellant's conduct in filing the complaints with the Mayor's Service Center and the I.A.D. and in calling the Human Relations Commission and Sergeant Diggans allowed the trier of fact to infer beyond a reasonable doubt that appellant intended to harass the two police officers and that his acts served *no* legitimate purpose. More particularly, the Commonwealth asks us to draw the necessary inferences from appellant's persistence in pursuing his complaint, even though he was repeatedly informed that the police officers followed appropriate procedures and that his complaint was, therefore, groundless. In *Commonwealth v. Duncan,* supra, we held that the trier of fact could reasonably infer from the defendant's lewd and illegal activities, in light of all the attendant circumstances, that the defendant intended to harass the victim and that his actions served no legitimate purpose. In the case at bar, however, appellant's actions are ostensibly protected by both the United States and Pennsylvania Constitutions which guarantee citizens the right to petition the government for a redress of grievances and to speak freely. We should be extremely reluctant to infer a criminal intent to harass solely from the filing of complaints with appropriate government agencies and the making of telephone calls during regular office hours lest we impermissibly chill a citizen's constitutional freedoms. *Zwickler v. Koota,* 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). Moreover, the record demonstrates that appellant had some

---

**5.** Judge Jacobs concurred in the result. Judges Hoffman, Price and Spaeth filed separate dissenting opinions which argued, for different reasons, that the defendant had not engaged in a "course of conduct" within the meaning of 18 Pa.C.S. § 2709(3).

reason to believe that his application had been at least accidentally mishandled. Both parties agree that the police officers refused the initial application, in part, because appellant's police record erroneously listed an outstanding theft charge. Also, the issuance of the transfer permit was admittedly delayed because appellant's police record was not rapidly updated to reflect the dismissal of the marijuana charges. When appellant pressed his complaint that his claim had been improperly and insultingly handled, the two accused police officers and an I.A.D. inspector did inform him that the police officers followed the applicable procedures. However, appellant received no response at all to his contention that the police officers had been rude. In fact, the Mayor's Service Center made no response whatsoever. Appellant filed his complaints with appropriate government agencies and made his telephone calls to Sergeant Diggans during regular business hours and before his complaint had been finally resolved. The Commonwealth did not rebut appellant's assertion that his actions were a product of the advice of his attorneys. Finally, appellant withdrew his I.A.D. complaint the day after he filed it. Given these attendant circumstances and the ostensibly lawful and constitutionally protected nature of appellant's acts, the trier of fact could only speculate that appellant intended to harass the two police officers and that his conduct served no legitimate purpose. *Commonwealth v. Long*, 470 Pa. 204, 368 A.2d 265 (Filed Jan. 28, 1977).[6]

We also believe that the Commonwealth did not establish that appellant's conduct alarmed or seriously annoyed the complaining police officers. In *Commonwealth v. Duncan*,

6. In *People v. Jemzura*, 29 N.Y.2d 590, 324 N.Y.S.2d 315, 272 N.E.2d 877 (1971), the New York Court of Appeals found insufficient evidence to establish an intent to harass, annoy or alarm the victim, despite much more outlandish and inflammatory conduct than in the case at bar. In *Jemzura*, defendant, distraught over the outcome of a family court proceeding, sought on two separate occasions to effect a citizen's arrest of the presiding judge. During the second incident, defendant, equipped with a tape recorder and microphone, accosted the judge in chambers, advised him of the intended arrest, and demanded a statement.

we emphasized that a defendant's acts must seriously offend the average person. *See also Commonwealth v. Schnabel,* supra; *People v. Carvelas,* 75 Misc.2d 616, 348 N.Y.S.2d 77 (1975), rev'd on other grounds, 35 N.Y.2d 803, 362 N.Y.S.2d 460, 321 N.E.2d 550 (1976). In the instant case, Sergeant Diggans testified that appellant's complaints greatly disturbed him and aroused his "Irishman's ire" because the complaints besmirched his previously spotless professional reputation. Officer Smolensky asserted that appellant's complaints substantially impaired his promotion prospects because they became part of his personal file. However, he conceded that the complaints were marked "totally unfounded." We do not believe that supervisory police officers would act so capriciously as to deny promotion to police officers on the basis of one totally baseless complaint over the course of a long and meritorious career. Officer Smolensky also testified that he became sick for two days because appellant's complaint aggravated a pre-existing nervous condition originally caused by an unrelated physical injury. However, we cannot say that appellant's apparently baseless complaints would so seriously offend an average police officer as to result in such illness. Indeed, police officers must expect, as part of their jobs exposing them to daily contact with distraught individuals in emotionally charged situations, to confront and answer accusations of rudeness and improper conduct.[7] *See Commonwealth v. Schnabel, supra* ; *People v. Smolen,* 69 Misc.2d 920, 331 N.Y.S.2d 98 (1972). Therefore, we hold that the Commonwealth did not introduce sufficient evidence to sustain a conviction of criminal harassment. We order that the judgment of sentence be vacated and appellant discharged.[8]

Judgment of sentence vacated and appellant discharged.

7. We are not now confronted with a situation in which appellant made threatening phone calls during an officer's off-duty hours or in which appellant deliberately and persistently invoked channels of relief outside the normal governmental process.

8. Because of this disposition, we do not address appellant's contentions that his conduct at most constituted a *de minimis* infraction of

JACOBS and CERCONE, JJ., dissent.

VAN der VOORT, J., did not participate in the consideration and decision of this case.

the penal law and that his conduct was constitutionally sheltered from criminal sanctions.