J-S57035-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| ANDREW JOSEPH KELLY, | : | |
| | : | |
| Appellant | : | No. 988 EDA 2017 |

Appeal from the Judgment of Sentence February 22, 2017
in the Court of Common Pleas of Montgomery County,
Criminal Division, No(s): CP-46-CR-0005040-2016;
CP-46-CR-0005878-2016

BEFORE: PANELLA, SOLANO and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:       **FILED OCTOBER 27, 2017**

Andrew Joseph Kelly ("Kelly") appeals from the judgment of sentence imposed following his conviction of two counts of harassment.[1] We affirm.

The trial court thoroughly set forth the factual and procedural history underlying this appeal in its Opinion, which we adopt as though fully set forth herein. **See** Trial Court Opinion, 5/10/17, at 1-12.

On appeal, Kelly presents the following issue for our review:

Was the evidence insufficient to make out the necessary elements of the crime of harassment, where the evidence did not establish that [Kelly] engaged in any of the behaviors proscribed by 18 Pa.C.S.[A.] § 2709 after February 25, 2016[, *i.e.*, the date on which the Commonwealth filed the harassment charges,] and where the evidence did not establish that he engaged in any conduct with the intent to harass, annoy or alarm the complainant[?]

Brief for Appellant at 4.

_____
[1] **See** 18 Pa.C.S.A. § 2709(a)(3), (7).

We apply the following standard of review when considering a challenge to the sufficiency of the evidence:

> The standard we apply … is whether[,] viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for [that of] the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that[,] as a matter of law[,] no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. … Finally, the finder of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Melvin*, 103 A.3d 1, 39-40 (Pa. Super. 2014) (citation omitted).

The Crimes Code defines the offense of harassment, in pertinent part, as follows:

> **(a) Offense defined.**— A person commits the crime of harassment when, with intent to harass, annoy or alarm another, the person:
>
> * * *
>
> (3) engages in a course of conduct or repeatedly commits acts which serve no legitimate purpose;
>
> (4) communicates to or about such other person any lewd, lascivious, threatening or obscene words, language, drawings or caricatures;
>
> (5)  communicates repeatedly in an anonymous manner;

- 2 -

(6) communicates repeatedly at extremely inconvenient hours; or

(7) communicates repeatedly in a manner other than specified in paragraphs (4), (5) and (6).

18 Pa.C.S.A. § 2709(a). A "course of conduct" is defined as, *inter alia*, "[a] pattern of actions composed of more than one act over a period of time, however short, evidencing a continuity of conduct." *Id.* § 2709(f). "An intent to harass may be inferred from the totality of the circumstances." **Commonwealth v. Cox**, 72 A.3d 719, 721 (Pa. Super. 2013). "This Court has held that 'with intent to harass,' in phone-call related cases, requires a determination of whether the caller knew or should have known that the effect of the call would be to harass the listener." **Commonwealth v. Duda**, 831 A.2d 728, 731 (Pa. Super. 2003) (citing **Commonwealth v. Hart**, 559 A.2d 584, 587 (Pa. Super. 1989)).

Kelly summarizes his challenge to the sufficiency of the evidence supporting his harassment convictions as follows:

Whatever may be said about [Kelly's] conduct prior to February 25, 2016, the evidence failed to establish that … Kelly criminally harassed Pastor [Kelly] Legg [("Pastor Legg")] **after** that date. There was only one direct communication between [] Kelly and Pastor Legg after February 26, 2016.[2] This sole interaction did

---

[2] Specifically, Kelly asserts that when he placed a telephone call to the church's "business line" on May 28, 2016, "Pastor Legg decided to take the call, rather than the church secretary. When [Pastor Legg] told [Kelly] not to call the church, [Kelly] told her that 'there would be consequences' if he was not a member of the church [(hereinafter, the "consequences remark")]. N.T. 1/10/17 at 99." Brief for Appellant at 16 (footnote omitted).

- 3 -

> not commence with an attempt by [Kelly] to contact [Pastor Legg] directly. That single telephone call certainly did not establish that [Kelly] communicated to or about Pastor Legg repeatedly, at extremely inconvenient hours, without a legitimate purpose and with the specific intent to harass, annoy or alarm her.

Brief for Appellant at 15 (emphasis in original, footnote in original omitted, footnote added). According to Kelly, his consequences remark to Pastor Legg

> simply indicated [Kelly's] intent to protest his exclusion [from the church,] and did not constitute a course of conduct or a pattern of actions intended to harass, threaten or annoy. *Compare* **Commonwealth v. Battaglia**, 725 A.2d 192, 194 (Pa. Super. 1999) ("a single act will not support a conviction").

Brief for Appellant at 19-20.

In its Opinion, the trial court concisely addressed Kelly's claim and determined that there was ample evidence to support the harassment convictions. **See** Trial Court Opinion, 5/10/17, at 18-19. We agree with the trial court's sound analysis and determination, and therefore affirm on this basis in rejecting Kelly's sufficiency challenge, **see id.**, with the following addendum.

Kelly's reliance on **Commonwealth v. Bender**, 375 A.2d 354 (Pa. Super. 1977) (*en banc*), is unavailing. The non-harassing conduct presented in **Bender** is not remotely analogous to Kelly's conduct in the instant case. **See id.** at 358-60 (concluding that the evidence was insufficient to sustain defendant's harassment conviction under 18 Pa.C.S.A. § 2709(a)(3), where the Commonwealth failed to establish that defendant's conduct (wherein he

- 4 -

filed several formal complaints against police officers who had denied his application for a handgun permit): (1) served no legitimate purpose; (2) alarmed or seriously annoyed the complaining police officers; or (3) evidenced an intent by defendant to harass, annoy or alarm).

Moreover, we reject Kelly's contention that the Commonwealth failed to establish that he had engaged in a "course of conduct" to sustain a conviction of harassment under 18 Pa.C.S.A. § 2709(a)(3). Kelly overlooks the fact that, in addition to the telephone call that he placed to the church on May 28, 2016, the Commonwealth presented evidence of numerous other harassing communications that Kelly made to Pastor Legg prior to the filing of the instant charges.[3] The Commonwealth presented ample evidence to establish that Kelly engaged in a course of conduct of making harassing communications to Pastor Legg that served no legitimate purpose. *See* 18 Pa.C.S.A. § 2709(a)(3); *accord Duda*, 831 A.2d at 731 (where the defendant had made several phone calls to his estranged wife in a single day, wherein he screamed obscenities and threatened her, holding that "[e]ven though the period was of relatively short duration, under the [statutory] definition, [defendant's] repeated calls were sufficient to prove a course of conduct.").

---

[3] Kelly did not challenge the introduction of this "prior bad act" evidence, which the trial court admitted under Pennsylvania Rule of Evidence 404(b). *See Commonwealth v. Dillon*, 925 A.2d 131, 141 (Pa. 2007) (discussing the purposes for which Rule 404(b) evidence may properly be admitted).

Accordingly, Kelly's sole issue on appeal lacks merit, and we thus affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/27/2017

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | No. CP-46-CR-0005040-2016 |
| | : | No. CP-46-CR-0005878-2016 |
| | : | |
| v. | : | |
| | : | 987 EDA 2017 |
| ANDREW KELLY | : | 988 EDA 2017 |

OPINION

Page, J.                                                                                        *May 10, 2017*

Defendant appeals from this Court's Judgement of Sentence on February 22, 2017. For the reasons set forth below, Defendant's appeal is without merit. Therefore, any claim of error on the part of this Court should be dismissed and the ruling should be affirmed.

## FACTS AND PROCEDURAL HISTORY

On July 8, 2016, the Defendant was charged with Stalking and two counts of Harassment, one as a misdemeanor of the third degree and one as a summary offense for incidents occurring after February 25, 2016. On August 11, 2016 the Defendant was again arrested and charged with Stalking and two counts of Harassment, for events occurring between February 25, 2016 and July 12, 2016. The Commonwealth alleged that the Defendant repeatedly contacted the victim, Kelly Legg, who was the Pastor of the First Baptist Church attended by the Defendant, and the Defendant continued to send messages after being warned to stop. The messages received by the victim included text messages with threats about consequences for the victim. The Commonwealth consolidated the two above captioned cases for trial, and the Defendant went to

A 1

trial on one count of Stalking and one count of misdemeanor Harassment. This Court ruled on the summary Harassment charge, finding the Defendant guilty after the jury trial concluded.

At trial, Kelly Legg, the victim, testified that she was the senior pastor of the First Baptist Church in Norristown for the past seven years. N.T. Trial 1/10/17 p. 30. The church has an average attendance of 80 people on Sundays and the pastor knows almost every member of the church personally. *Id.* at 31. The church is also led by the Church Council which is composed of 12 lay members. *Id.* Pastor Kelly makes herself available to the church community and everyone has her cell phone number and most people are also Facebook friends with the church. *Id.* at 32. Pastor Legg knew the Defendant from his attendance at church since 2010, and she baptized him in 2011. *Id.* at 33. The Defendant also became part of the Church Council, so Pastor Kelly had regular communication with him and the other council members. *Id.* In October 2014, the Defendant approached Pastor Kelly, expressed his attraction to her, and asked if she wanted to date him. *Id.* at 34. Pastor Kelly told the Defendant she was not interested, and the Defendant said they would be fine. *Id.* at 34-35. The Defendant was passive aggressive toward the pastor over the next few months, but things returned to normal by the end of the fall of 2014. *Id.* at 35.

The Defendant and Pastor Kelly sent text messages regarding church issues and members of the church until 2015. *Id.* at 36. In August 2015, while at Vacation Bible School, the Defendant asked Pastor Kelly to come to dinner with him and another couple. *Id.* at 37. Pastor Kelly declined, and every day that week the Defendant called or texted Pastor Kelly asking if she was going to attend. *Id.*

The Commonwealth admitted C-1, the text messages received by Pastor Kelly since August 2015. *Id.* at 40. Prior to the admission of the text messages, this Court instructed the jury on the limited use for which they could consider prior bad acts evidence. *Id.* at 43. In the text

A 2

messages and Facebook messages, Pastor Kelly again refused the invitation to dinner made by the Defendant which led him to inform her that he could no longer help the church with 5 tasks he had previously agreed to do. *Id.* at 45. That text was followed by the Defendant saying "Just venting, I'll be there." *Id.* at 46. The Defendant then sent more Facebook messages which Pastor Kelly believed were inappropriate such as "I love you," so she set up a phone call with the Defendant. *Id.* at 47. After the call, the Defendant thanked the Pastor by text, and said he hoped they could still be friends. *Id.*

The Defendant posted on Facebook saying no one loved or cared for him, and Pastor Kelly texted the Defendant that they will always be friends and to discuss with other Church members his decision to leave the church. *Id.* at 48. Pastor Kelly asked "how can we better show that you are genuinely and authentically loved," referring to the love of his church and mentioning that the church and its people cared for him. *Id.* at 49. Pastor Kelly next received a series of text stating "I wish we were truly friends, "Seriously, no response," "I hope you give me a chance to have a conversation with you," and "silence is deafening." *Id.* at 51. Those texts were received at 3:04 PM, 6:26 PM, and 11:37 PM. *Id.* By the next morning, the Defendant was apologizing and sent messages stating "Satan stole my smart, I'm sorry for everything I said. Smart Phone." *Id.* There were also messages sent on Facebook including: a missed call at 11 PM on August 16, 2015, and an "I love you" followed by multiple exclamation marks on August 21, 2015 that the Defendant said he meant to send to someone else. *Id.* at 59.

Pastor Kelly met with the Defendant in the beginning of September and told the Defendant he couldn't send these types of texts. *Id.* Pastor Kelly insisted on a face to face meeting where she told the Defendant she was putting boundaries in place. *Id.* at 52. This made him angry and the Defendant told Pastor Kelly that this was her fault and if she would "just

A 3

respond" things would possibly be different. *Id.* The Defendant was told he could not have inappropriate contact with Pastor Kelly. *Id.* at 53. He was told that communications needed to be in person, not text messages in the middle of the night, and the communications needed to be about the church. *Id.* at 53-54. On September 7, after the in person meeting, the Defendant messaged saying "I guess texting, Facebooking, speaking are violations of external boundaries." *Id.* at 59. The Defendant then said "what other congregant do you hate enough not to at least text him or her back." *Id.* At 9:32 PM, the Defendant sent a message saying "Like your grandfather, ignoring people like they don't exist, not a great quality for a pastor." *Id.* at 60. At 9:50 PM, the Defendant said the Pastor and First Baptist Church had dumped him. *Id.* On September 23, there was another text exchange where the Defendant said he's sad, and Pastor Kelly asked if she could help, the way she would counsel any other church member. *Id.* at 54-55. There was also a Facebook message saying "I like you, what can we do about this" at 11:51 that night from the Defendant. *Id.* at 60. At 12:30 AM the next day, another message was sent. *Id.*

At 10:57 PM on September 24, the Defendant sent a message asking if "we are okay" after crying though most of bible study that night and then leaving immediately thereafter. *Id.* at 61. Pastor Kelly responded "I'm not sure, sir, I was trying to decide based off the measure of irritation on your face tonight and your quick exit." *Id.* at 61. The Defendant responded with a thumbs up sign and said "Hard to hide irritation. A woman without a heart." *Id.* Pastor Kelly said good night at that point and told the Defendant to speak to her face to face if he wanted to talk, but not to send passive-aggressive messages. *Id.* After a few more exchanges, at 7:07 AM the next day the Defendant sent a thumbs up sign, at 10:57 PM that night sent a message saying "I'm sorry," and just before midnight sent a text saying "you obviously dislike me. I should do the same in return." *Id.* at 62. Pastor Kelly responded by copy and pasting her previous response

about speaking face to face. *Id.* The Defendant answered by saying "nice original response." Later at 1:23 PM, the Defendant sent another message saying "Pastor Legg, you are obviously not a friend." *Id.* at 63. On September 26, Defendant sent another message saying "I hope you are well. Please call me for a civil conversation between friends." *Id.*

Pastor Kelly then went to four other church members, showed them the text messages, told them about the phone calls and in person meetings, and asked them to help make the Defendant stop. *Id.* at 55-56. The Defendant sent another message discussing how the issue was brought up to the executive committee and told Pastor Kelly "that is totally legit. I want to let you know that I accept 100 percent of the responsibility. I hope you understand that I need to find another place of worship." *Id.* at 65.

On September 30, a meeting with the Defendant occurred, and the council and Pastor Kelly met with the Defendant and gave him a piece of paper with boundary rules that they had also orally discussed. *Id.* at 67. They reiterated that there should be no Facebook or text messaging contact at all and no harassing contact in any form. *Id.* Any communication with the Pastor needed to be in person with a third party present or through email, but only discussing the church. *Id.* The letter also asked the Defendant to take time and space to "find healing." *Id.* at 71. The executive committee also requested the Defendant take a sabbatical from leadership roles for at least 3 months, and then the executive leadership would determine whether the Defendant could return in a leadership role. *Id.* The executive committee also requested the Defendant attend counseling and provide a record of attendance after 3 months. *Id.* at 72. Between September and December the Defendant stopped texting Pastor Kelly but continued to send Facebook messages. *Id.* at 66.

On October 3, the Defendant sent a message saying "hi" and Pastor Kelly responded in kind and said she hoped to see the Defendant at church. *Id.* The next day, the Defendant said thank you. *Id.* at 67. On October 6, at 5:10 PM, the Defendant sent a thumbs up and at 9:48 PM, the Defendant sent a message saying "seriously, no response to besmirching my reputation. "*Id.* At 10:27 PM, the Defendant said "Stop sending your surrogates to speak with me. I'm sorry, but we are over." *Id.* at 67-68. Again, later that evening, the Defendant asked "not that it's any of my business but do you have a boyfriend." *Id.* at 68. On October 7, the Defendant sent a message that said "Why should I get sober. You still will not like me." *Id.* Then again, at 9:27 PM that night, the Defendant sent a message saying "Hi, PK. Can we have any type of communication," followed by another message at 9:58 PM that said "Can't we be civil adults. Be honest. Have blocked or chose to ignore my message. So I have a pastor who refuses to communication with me at 10 PM, not even 3 AM. Are you telling me to leave FBC [First Baptist Church]. Because that is what it feels like." *Id.* Later, at 10:54 PM, the Defendant sent a message saying "Call me some time tomorrow, please." *Id.* Pastor Kelly did not respond to any of those messages. *Id.*

On November 15, the Defendant sent a message stating "I do appreciate you as my pastor. Thank you." *Id.* at 75. On December 24, at 8:03 PM the Defendant sent a message saying "I wish we could be good friends." *Id.* On Christmas day, at 8:25 PM, the Defendant sent a text message saying "Is a real friendship possible, I need to know to make decisions about the future." *Id.* at 76. At 10:24 PM that night, he said "Hate is a more loving thought than indifference. At least a hating heart cares." *Id.* The next day, the Defendant sent yet another message saying "A Christmas present for you. I am leaving FBC" and "I gave you all the documents that you need for Frank, your boss, and the self-appointed church leadership team. Hang me." *Id.* The Defendant then sent a message at 8:06 PM that night saying to call him if she

*A* 6

wanted to talk. *Id.* at 77. Pastor Kelly didn't call or respond to any of these messages. On December 27, the Defendant sent more messages including "Be a hypocrite, go preach your interpretation of God's word," "I admit my defects in character, why don't you do the same. I did not choose you as an enemy, you chose me," and "enjoy your vacation." Later that same day, the Defendant sent a Facebook message saying "You do not love people." *Id.* At 4:03 PM, the Defendant said "I have justified hatred towards you," and at 8:10 PM said "You are a wicked and awful person." *Id.* The Defendant continued to send messages and on December 29, at 5:49 PM, sent a picture of an actor. *Id.*

On December 27, 2015, while the Defendant was sending messages, Pastor Kelly talked to the executive team and showed them the messages. *Id.* at 77. Pastor Kelly and two members of the executive team went to the Defendant's house to reiterate boundaries and told the Defendant he had to stop. *Id.* at 78. The Defendant became angry, screamed that it was Pastor Kelly's fault, he was justified in hating her and being angry and harassing Pastor Kelly. *Id.* Then the Defendant left his own home. *Id.* Later that day, Pastor Kelly got a text apologizing and telling her not to drop by again. *Id.* That night, the Defendant sent a message saying "You are evil." *Id.* On December 28, the Defendant sent a crying emoji and then another message that said he loved Pastor Kelly. *Id.* More messages came in asking to talk in early January, and Pastor Kelly called one of the executive council members to find a time for them to all meet. *Id.* at 79. They decided to meet in person on Wednesday. *Id.* At 5:15 AM on that Wednesday, Pastor Kelly got a message saying the Defendant was canceling. *Id.* During this time, the executive council met again, extended the Defendant's suspension, and the executive team told the Defendant he had to stop. *Id.* at 80.

*A*7

On January 30, 2016, the messages began again. *Id.* Between 9:19 PM and 11:22 PM the Defendant sent the following messages: "Ignoring someone is the cruelest method of emotional abuse," "please say something," "you are the worst pastor in the world. You," "I can't figure out how to work my delete key," and "how can we be friends." *Id.* at 80-81. On February 8, the Defendant sent a text asking if Pastor Kelly loved him and said "I guess not." *Id.* at 84. On February 10, the Defendant sent a message requesting to be friends, two separate times. *Id.* at 81. On February 11, the Defendant said "I need your friendship," "I care for you. I just hope that we can be friends. If we cannot please let me know. Love ya. Can I do anything to help you or the church," "hi, Kelly. I am so content about how I can help. Let me know how I can help other people," "I love you. You don't care," "are you a mature enough pastor to meet face-to-face. Thirty years old I would think so," and "why do you hate me. It seems so unlike you. I hope you die." *Id.* at 81. The Defendant also sent a link to a "celebrate recovery" page. *Id.* The Defendant tried to video chat at 9:32 PM and Pastor Kelly declined the call. *Id.* There were also 3 text messages sent during this time asking to be friends and then asking Pastor Kelly to respond. *Id.* at 84. The Defendant continued to text and attempt to call. *Id.* at 82. He asked how to make things better and Pastor Kelly replied that he could enroll in intensive rehab and stop sending text messages. *Id.* at 83. The Defendant replied by saying Pastor Kelly didn't have a pastor's heart and she should find a new career. *Id.* at 83. He continued to text after that response. *Id.*

On February 15, the Defendant sent another text saying he had attended therapy for Pastor Kelly and stopped drinking for her. *Id.* at 84. He asked if she would like him more if he agreed to "do this for her." *Id.* The Defendant said "if not you have no dominion over me and you and FBC will have to accept me for who I am, not a bad guy after all." *Id.* at 84-85. Pastor Kelly responded that he needed to make the changes for himself. *Id.* The Defendant again asked

if this means she won't like him, and sent a few more texts. *Id.* at 85. On February 19, the Defendant again asked for an answer from Pastor Kelly, and asked if she was an ally or enemy. *Id.* at 85-86. On February 22, 2016, the Defendant asked to be accepted on the FBC Facebook page. *Id.* at 86. The last text sent by the Defendant was on July 7 saying "yeah." *Id.* at 86.

While the messages were being sent, on January 24, 2016, Pastor Kelly was home shoveling her drive way when the Defendant showed up. *Id.* at 87. There was a lot of snow, and Pastor Kelly was afraid the police wouldn't be able to arrive quickly and she thought she was "in trouble. Because I don't get to control what Andy does. And this stuff is causing me enough stress and now I've got him on my property." *Id.* Pastor Kelly asked the Defendant to leave and he did. *Id.* Pastor Kelly was afraid and thought about when the next time would be. *Id.* After the February texts, Pastor Kelly silenced the messages on her phone so she wouldn't receive them. *Id.* Based on the February 11, 2016 message where the Defendant said "I hope you die," a council member recommended contacting the police. *Id.* at 89. The police went and spoke to the Defendant. *Id.* at 90. Shortly after the police spoke to the Defendant, he went to rehab in New Jersey where he didn't have a phone. *Id.* at 91.

The conduct between February 25, 2016 and July 11, 2016 form the basis of the charges. In May, the Defendant checked himself out of rehab, and began writing things on Facebook in general, not sending messages directly to the Pastor. *Id.* at 92. On May 22, 2016, another council meeting took place, and the Defendant's membership in the Church was suspended. *Id.* at 93. The Defendant was notified that he was not welcome on church property, and could not contact Pastor Kelly. *Id.* at 93-94. On May 25, when the Defendant received the letter about his suspension, he called the church, and the next day he left a message requesting time to have his picture taken for the church photo directory. *Id.* at 98. On May 27, the Defendant called again

A 9

and the secretary answered without checking caller ID. *Id.* at 99. The secretary was "panicked" about having him on the phone, so Pastor Kelly said she would speak to him. *Id.* Pastor Kelly again advised that the Defendant could not call the church. *Id.* The Defendant said that if he was not a member, there would be consequences. *Id.* Pastor Kelly said if he called again she would contact the police, and hung up the phone. *Id.* Pastor Kelly called the police again because of the threat. *Id.* at 100-101. On June 1, 2016, Pastor Kelly went on sabbatical. *Id.* at 102-103. The actions of the Defendant caused Pastor Kelly a lot of stress, she considered quitting her job for the first time, carried mace, and felt unsafe. *Id.* at 103.

Officer Natalini testified that in February 2016 he was sent to First Baptist Church for a harassment issue, met with Pastor Kelly, and on February 17, 2016 went to the Defendant's home to speak with him. N.T. 1/11/17 Trial p. 39-43. The Defendant was not home, so Officer Natalini attempted to call the Defendant, and was eventually able to reach him. *Id.* at 44. The Officer explained the situation to the Defendant and told the Defendant to stop contacting Pastor Kelly. *Id.* The Officer later got a dispatch call to the Defendant's home, and the Defendant said he wanted to file a slander report against Kelly Legg because he felt he was wrongfully accused. *Id.* at 46. The Officer's advised that because Kelly Legg was a victim, they would not make that report. *Id.* Officer Natalini again advised the Defendant to have no direct or indirect contact with the victim. *Id.* at 47. On February 22, 2016, Officer Natalini responded yet again to Kelly Legg because of a harassing message. *Id.* at 48. The Officer issued a citation for harassment. *Id.*

Diana Mitchell, one of the church leaders and part of the executive committee, was told in August about the text messages, and she clarified with the Defendant that he was to have no contact with Pastor Kelly privately, and no text messages or Facebook messages should be made. *Id.* at 59. Ms. Mitchell helped the Defendant get into rehab, but after he learned of the

harassment citation, he became angry and on his pass day out of rehab he came to Ms. Mitchell's house and said the Pastor was evil and the church was rejecting him. *Id.* at 74-76. The Defendant then became part of a group text between the church committee members and himself, and he sent multiple messages asking for the date when he was voted out of the church. He eventually asked if the church intended to take action against Pastor Kelly. *Id.* at 80-92. Pastor Kelly had been informed of those text messages. *Id.* at 94.

Officer Bishop was called to the church on May 25, 2016 and he saw that the Defendant had called the Church on the caller ID. He was told the history of the case. *Id.* at 125-126. He went to the Defendant's house, and the Defendant said he didn't remember being told not to contact Pastor Kelly, but remembered being cited. *Id.* at 127. Officer Bishop reiterated that the Defendant was to have no contact with the victim. *Id.*

On May 26, 2016, Detective Naber became involved in the case and went to the Defendant's home and advised him to stop the harassment immediately, and said the Defendant was no longer welcome on the church premises. *Id.* at 130. The Defendant also claimed that when he told Pastor Kelly there would be consequences, he didn't mean physically, but consequences from the Lord. *Id.* at 131. The Detective again told the Defendant to have no contact, and that if he did, the Detective would have to start arresting him. *Id.* at 131-132. When the Detective got to the door, the Defendant told the Detective if he had more contact with Pastor Legg to come and arrest him. *Id.* at 132. In the middle of June, Deacon Diane called the detective, said the Defendant had called her 15-20 times that weekend, and threatened to come to the church on Sunday. *Id.*

The Defendant testified that on the day he went to Pastor Kelly's house, he was going to shovel her driveway. *Id.* at 150-152. The Defendant also said when he called the church on May

A 11

25, 2016, he called the business line because it was important to the Defendant to be in the directory which isn't done annually. *Id.* at 161-162. The Defendant said that at the end of that conversation when he told Pastor Kelly there would be consequences he meant the biblical consequences that Pastor Kelly teaches about in bible study. *Id.* at 163. The Defendant agreed that after he talked with Pastor Kelly in August he continued to send personal messages. *Id.* at 170. He also received the September letter advising him not to contact Pastor Kelly on Facebook or by text messaging. *Id.* at 171. The Defendant also agreed Officer Natalini told him to have no personal contact with Pastor Kelly. *Id.* at 175. He agreed that Officer Bishop had told him to have no contact with Pastor Kelly. *Id.* at 180. The Defendant admitted that while in rehab he wrote a letter that he intended to send to Pastor Kelly. *Id.* at 181.

On January 10, 2017, the Defendant was found guilty of Harassment and not guilty of Stalking following a jury trial. This Court found the Defendant guilty of summary harassment. On February 22, 2017, this Court sentenced the Defendant to time served to twelve months incarceration with credit for over six months of incarceration on the misdemeanor Harassment charge and no further penalty for the summary Harassment. The Defendant was ordered to stay away from the victim.

On February 27, 2017, a motion for a judgement of acquittal, an arrest of judgment, or a new trial was filed alleging the verdict was against the weight of the evidence. That motion was denied the same day. On March 20, 2017, the Defendant filed a timely Notice of Appeal.

## ISSUES

Defendant's Concise Statement, received in chambers on April 25, 2017, raises the following issues:

1. The trial court erroneously overruled the defense objection to the introduction of extensive text and email messages from Appellant to the complainant during time periods

which were not included in the criminal complaint, where the prejudicial effect of these prior bad acts outweighed their probative value.

2. The evidence was insufficient to make at (sic) the necessary elements of the crime of harassment, where the evidence did not establish that Appellant engaged in any of the behaviors proscribed by 18 Pa.C.S. § 2709 and where the evidence did not establish that he engaged in any conduct with the intent to harass, annoy or alarm the complainant.

3. The court erroneously denied Appellant's motion for a new trial because the verdict was against the weight of the evidence, where he evidence did not establish that Appellant engaged in any of the behaviors proscribed by 18 Pa.C.S. §2709 and where the evidence did not establish that he engaged in any conduct with the intent to harass, annoy or alarm the complainant.

## ANALYSIS

### 1. Admission of Prior Bad Acts

Rulings on the admissibility of evidence are within the discretion of the trial judge, and such rulings form no basis for a grant of appellate relief absent an abuse of discretion. *Commonwealth v. Reid*, 571 Pa. 1, 811 A.2d 530, 550 (2002). "An abuse of discretion may not be found merely because an Appellate Court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Commonwealth v. Sherwood*, 603 Pa. 92, 982 A.2d 483, 495 (2009) (quoting *Commonwealth v. Dillon*, 592 Pa. 351, 925 A.2d 131, 136 (2007) (citation omitted)).

Rule 404 (b) holds that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404. However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." *Id.*

"While it is true that evidence of prior crimes and bad acts is generally inadmissible if offered for the sole purpose of demonstrating the defendant's bad character or criminal

*A* 13

propensity, the same evidence may be admissible where relevant for another purpose. Examples of other such relevant purposes include showing the defendant's motive in committing the crime on trial, the absence of mistake or accident, a common scheme or design, or to establish identity. Relevant to the instant case, the evidence may also be admitted where the acts were part of a chain or sequence of events that formed the history of the case and were part of its natural development. Of course, in addition to the relevance requirement, any ruling on the admissibility of evidence is subject to the probative value/ prejudicial effect balancing that attends all evidentiary rulings." *Commonwealth v. Powell*, 598 Pa. 224, 245–46, 956 A.2d 406, 419 (2008) (internal cites omitted).

"Additionally, when examining the potential for undue prejudice, a cautionary jury instruction may ameliorate the prejudicial effect of the proffered evidence." Pa.R.E. 404(b) cmt; *Commonwealth v. Dillon*, 592 Pa. 351, 925 A.2d 131, 141 (2007). Jurors are presumed to follow the trial court's instructions. *Commonwealth v. Baker*, 531 Pa. 541, 614 A.2d 663, 672 (1992). (*See Commonwealth v. Sherwood*, 603 Pa. 92, 982 A.2d 483, 497–98 (2009) (finding that cautionary instructions were sufficient to overcome the prejudicial effect of prior bad acts evidence); *Commonwealth v. Williams*, 586 Pa. 553, 896 A.2d 523, 540 (2006) (holding that any error in admission of prior bad acts was cured by the trial court's contemporaneous administration of a cautionary instruction and by its final instruction limiting the jury's consideration of the prior bad acts evidence); *Commonwealth v. Claypool*, 508 Pa. 198, 495 A.2d 176, 179–180 (1985) (same)). *Commonwealth v. Hairston*, 624 Pa. 143, 160, 84 A.3d 657, 666–67 (2014).

In other stalking and harassment cases, prior conduct by the defendant was admissible under the prior bad acts exception to show a course of conduct by the defendant. In *Commonwealth v.*

*Urrutia*, the defendant came to the victim's house at least twice and threatened the victim despite having an active Protection from Abuse order against him. 439 Pa.Super. 227, 234–35, 653 A.2d 706, 709–10 (1995). The Superior Court held that the "prior bad acts were properly admitted to establish defendant's intent to stalk his victim. The testimony permitted the inference that defendant intended to cause Thompson to fear for her physical safety or intended to cause her emotional distress. Alternatively, the bad acts were also admissible to show a 'course of conduct,' an element of the crime. In this case, the prior bad acts establish the course of conduct." *Id.*

In *Commonwealth v. Evans,* the Superior Court examined the admissibility of prior bad acts to prove the existence of a course of conduct for harassment. 299 Pa.Super. 529, 445 A.2d 1255 (1982). There, the Superior Court found "that proof of a course of conduct 'undermines the appellant's contention that the reviewing court is precluded from examining the testimony elicited regarding matters that occurred prior to ... the date of the complained of conduct...Course of conduct by its very nature requires a showing of a repetitive pattern of behavior. Therefore, where evidence of prior bad acts is necessary to establish the pattern, the evidence is admissible.'" *Commonwealth v. Urrutia*, 439 Pa.Super. 227, 234–35, 653 A.2d 706, 709–10 (1995) (citing *Commonwealth v. Evans*, 299 Pa.Super. 529, 445 A.2d 1255 (1982)). Additionally, in *Evans*, the defendant did not deny that the conversations at issue occurred, he "merely refutes that his actions were done with an intent to harass. Thus, the introduction of evidence of the prior acts was relevant and admissible, inasmuch as it 'tended to prove that the alleged offense [ ] .... constituted part of an overall scheme of harassment of the prosecutrix.'" Moreover, the evidence of the prior acts was germane to establish an element of the offense, i.e.,

criminal intent. *Commonwealth v. Evans*, 299 Pa.Super. 529, 534–35, 445 A.2d 1255, 1257–58 (1982) (internal cites omitted).

In this case, the text messages and Facebook messages establish both intent and course of conduct. The Defendant was charged with Stalking and Harassment, and the Defendant denied that he intended to harass, alarm, or annoy the victim. *Evans* directly contradicts Defendant's claim that acts prior to the date of the complaint aren't admissible. The prior bad acts in this case established a pattern of behavior which was necessary to proving the Commonwealth's case. The evidence also helped refute the Defendant's claim that he lacked the requisite intent. The context of the prior repeated text messages and Facebook messages help to show that the Defendant knew the contact was alarming or annoying to the victim but continued his actions. Additionally, the texts do not alone establish criminal propensity or bad character and therefore could not be admitted for that purpose alone. These texts only become criminal and relevant in the context of the repeated unwanted contacts with the victim and the prior orders to cease such conduct.

Finally, this Court gave a limiting instruction to the jury immediately prior to the introduction of the messages that constituted the prior bad acts evidence, thereby limiting any prejudice, as juries are presumed to follow the trial court's instructions. *See Commonwealth v. Baker*, 531 Pa. 541, 614 A.2d 663, 672 (1992). Thus, the probative value was high, the prejudicial value was *de minimis,* and the prior bad acts evidence was properly admitted. This claim must fail.

## 2. Sufficiency of the Evidence

Whether sufficient evidence exists to support the verdict is a question of law; an Appellate Court's standard of review is *de novo* and their scope of review is plenary. *Commonwealth v.*

*Walls*, 144 A.3d 926, 931 (Pa. Super. 2016) (citation omitted). When reviewing challenges to the sufficiency of the evidence, Appellate Courts evaluate the record in the light most favorable to the Commonwealth as verdict winner, giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. *Commonwealth v. Duncan*, 932 A.2d 226, 231 (Pa.Super.2007) (citation omitted). "Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt." *Id.* (quoting *Commonwealth v. Brewer*, 876 A.2d 1029, 1032 (Pa.Super.2005)).

Additionally, the Commonwealth need not establish guilt to a mathematical certainty, and it may sustain its burden by means of wholly circumstantial evidence. *Id.* Moreover, the Appellate Court may not substitute its judgment for that of the factfinder, and where the record contains support for the convictions, they may not be disturbed. *Id.* Lastly, the finder of fact is free to believe some, all, or none of the evidence presented. *Commonwealth v. Hartle*, 894 A.2d 800, 804 (Pa.Super.2006). *Commonwealth v. Smith*, 2016 PA Super 187, 146 A.3d 257, 261–62 (Pa. Super. Ct. 2016). Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. *Commonwealth v. Mucci*, 2016 PA Super 137, 143 A.3d 399, 409 (Pa. Super. Ct. 2016), *reargument denied* (Aug. 31, 2016).

Here, the Commonwealth charged the Defendant with misdemeanor harassment under § 2709 (a) (7). To find the Defendant guilty of misdemeanor Harassment under this section, the Commonwealth must prove that "with intent to harass, annoy or alarm another, the person

communicates repeatedly in a manner <u>other than specified in paragraphs (4), (5) and (6)</u>,"[1] 18 Pa.C.S.A. § 2709 (a) (7) (emphasis added). To prove the summary Harassment charge, the Commonwealth must prove that "with intent to harass, annoy or alarm another, the person engages in a course of conduct or repeatedly commits acts which serve no legitimate purpose." *Id.* at (a) (3).

The Defendant claims on appeal that he didn't engage in the proscribed behaviors and lacked the requisite intent to harass, annoy, or alarm. The Defendant called the church where Pastor Kelly was in charge and spoke to her on the phone after being warned by police, Pastor Kelly, and the executive committee to have no contact with Pastor Kelly. He also specifically told Pastor Kelly that there would be "consequences" for her actions. While the Defendant claims that he meant biblical consequences, this Court and the jury clearly did not believe that to be the case. The jury found the Defendant guilty of harassment.

After the repeated warnings not to contact Pastor Kelly, and her clear setting up of boundaries, the Defendant could not have contacted her without intending it to be harassing or annoying or alarming when his victim had specifically told him to stop, had involved the police, and had involved other church members to tell him his behavior was harassing and unacceptable. Additionally, the Defendant repeatedly communicated with Pastor Kelly Legg after being warned to stop. The Defendant himself does not deny repeated contacts with Kelly Legg even after being warned to stop. The Defendant merely claims he lacked the necessary intent.

This case is similar to *Evans,* in that the Defendant does not deny repeated contacts, but denies the intent to harass, annoy, or alarm. Where the Defendant engaged in repetitive behaviors and contacts like he did in this case which could have no legitimate purpose after the victim

---

[1] (4) communicates to or about such other person any lewd, lascivious, threatening or obscene words, language, drawings or caricatures;(5) communicates repeatedly in an anonymous manner;(6) communicates repeatedly at extremely inconvenient hours. 18 Pa.C.S.A. § 2709 (a).

clearly expressed feeling harassed, said that there was no relationship outside the church, and told the Defendant to stop contacting her via Facebook or text message, there is repeated communication and a course of conduct of behavior lacking in legitimate purpose.

Because the Defendant had the intent to harass, annoy, or alarm and also engaged in a course of conduct that had no legitimate purpose other than to annoy or harass the victim and repeatedly communicated to the victim, Pastor Kelly Legg, the evidence supports each element of the summary harassment and misdemeanor harassment charge, and this claim must fail.

### 3. Weight of the Evidence

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. *Commonwealth v. Clay*, 619 Pa. 423, 64 A.3d 1049, 1054–55 (2013) (quotation marks, quotations, and citations omitted). In order for an appellant to prevail on a challenge to the weight of the evidence, "the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Commonwealth v. Sullivan*, 820 A.2d 795, 806 (2003) (quotation marks and quotations omitted). *Commonwealth v. Smith*, 2016 PA Super 187, 146 A.3d 257, 264–65 (Pa. Super. Ct. 2016). *Commonwealth v. Devine*, 2011 PA Super 163, 26 A.3d 1139, 1146 (Pa. Super. Ct. 2011). A trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings. *Commonwealth v. Diggs,* 949 A.2d 873, 879–80 (Pa. 2008).

The Defendant makes the same claim on appeal about the weight of the evidence as he did for the sufficiency of the evidence. The Defendant claims that he lacked the intent to harass,

annoy, or alarm Kelly Legg and he claims he did not engage in kind of behavior prohibited under the Harassment statute. This Court has already addressed the evidence which supports these charges. The Defendant could have no other intent but to harass, annoy, or alarm Pastor Kelly Legg in the face of repeated warnings to stop contacting the victim. The Defendant also admitted to the repeated contacts with the victim. Therefore, this Court and a jury found that the Defendant had the intent to harass, annoy, or alarm Kelly Legg, and the Defendant admitted to the repeated contact of the victim after being repeatedly warned to stop. The evidence of repeated contacts is uncontested, and the nature of the facts do not support an intent other than to harass, annoy, or alarm. It cannot be said that the evidence is so vague or tenuous that it shocks the conscience and this claim is thus without merit.

## CONCLUSION

For all of the aforementioned reasons, this Court's decision and order should be **AFFIRMED.**

BY THE COURT:

_____
GARRETT D. PAGE,      J.

Copies of the above Opinion
Mailed on 5 20 - 17
By Interoffice Mail to:
Robert Falin, Esq., ADA
Paul George, Esq., PD
Anne Schools – Court Administration
By First Class Mail to:
Andrew Kelly, Defendant

_____
Judicial Secretary

A 20