J-A29038-22

2023 PA Super 25

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MICHAEL J. CONIKER | : | |
| | : | |
| Appellant | : | No. 23 WDA 2022 |

Appeal from the Judgment of Sentence Entered August 18, 2021,
in the Court of Common Pleas of Allegheny County,
Criminal Division at No(s): CP-02-CR-0014079-2018.

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MICHAEL J. CONIKER | : | |
| | : | |
| Appellant | : | No. 24 WDA 2022 |

Appeal from the Judgment of Sentence Entered August 18, 2021,
in the Court of Common Pleas of Allegheny County,
Criminal Division at No(s): CP-02-CR-0006879-2018.

BEFORE: BENDER, P.J.E., OLSON, J., and KUNSELMAN, J.

OPINION BY KUNSELMAN, J.:                    **FILED: FEBRUARY 15, 2023**

Michael Coniker appeals from the judgments of sentence entered against him following his convictions at two criminal dockets for harassment, disorderly conduct, and criminal trespass. He challenges the sufficiency of the evidence for every conviction. We reverse in part and affirm in part.

**Background**

These cases concern two separate incidents, which gave rise to separate criminal complaints, docket numbers, and dispositions. We will refer to the case at CP-02-CR-0006879-2018, No. 24 WDA 2022 as "the Office Case" and the case at CP-02-CR-0014079-2018, No. 23 WDA 2022 as "the Church Case."

The trial court set forth the facts at the Office Case as follows:

Some time prior to March 1, 2017, Attorney James Herb represented Mr. Coniker. Mr. Coniker and Attorney Herb eventually had a falling out, and Attorney Herb informed Mr. Coniker that he was not permitted to enter Attorney Herb's offices and that if Mr. Coniker did so, Attorney Herb would have him arrested. Knowing that he was not permitted to enter Attorney Herb's offices, Mr. Coniker called Attorney Herb's offices and started to record the telephone conversation. The call was then disconnected, and neither Attorney Herb, nor anyone from his office elected to call back Mr. Coniker.

Accordingly, after being told he was not permitted to enter Attorney Herb's offices and having also unsuccessfully tried to speak to Attorney Herb and his office by telephone, Mr. Coniker, knowing he was not welcome, decided to try to communicate again with Attorney Herb by entering Attorney Herb's offices on March 1, 2017. Mr. Coniker made this entrance immediately after leaving the local magisterial district judge's offices, where he made threats regarding a weapon because his case therein had been postponed. Despite his incredible assertions to the contrary, Mr. Coniker's intent when entering Attorney Herb's offices was to cause disruption and to frighten, scare, and alarm its occupants, just like he had intended to and did moments before at the magistrate's office.[1]

Mr. Coniker's conduct inside Attorney Herb's office achieved Mr. Coniker's intent. He was threatening and frightening to the office's occupants. Attorney Herb's staff, including Janet Knochel, who encountered Mr. Coniker in the offices, were, in fact, so concerned about Mr. Coniker that they called the police and fled

_____

[1] Coniker disputes this factual finding of his intent, as described *infra*.

the offices. Mr. Coniker was screaming [into a cell phone, "I'm at Attorney Herb's office and I got a gun."]

The impact on Attorney Herb's office was such that following the incident with Mr. Coniker, the "format of [the] office" changed. Attorney Herb explained:

> Subsequent thereto … I put a metal door in at the top of the ramp and bullet proof glass in to protect the front office assistants. And so nobody can get into the interior offices without us buzzing them in or letting them in. And there's a speaker box on the bullet proof glass that allows the front office assistant to speak and hear the people who come in … from the outside. And the wall goes up to the ceiling now, so that the front is secure. You can't enter in, you can't get into the offices without someone letting you in . . . .

Eventually, the police arrived at Attorney Herb's offices. Notably, prior to being dispatched to Attorney Herb's offices, the police had been forced to respond to the local magistrate's office to deal with Mr. Coniker's conduct there, where they took the magisterial district judge and his staff into safety and placed the courtroom in lockdown. Once at Attorney Herb's offices, law enforcement caught up to Mr. Coniker and saw and heard him screaming, yelling, and berating Attorney Herb. Mr. Coniker was ultimately arrested.

Trial Court Opinion, 3/9/22, at 4–6 (record citations omitted).

Approximately 18 months after the events in the Office Case, Coniker was involved in an incident at Assumption Church. The trial court set forth the facts from the Church Case as follows:

> Mr. Coniker has a turbulent relationship with Assumption Church. Indeed, prior to September 20, 2018, the police had been summoned to escort Mr. Coniker from the church's property on multiple occasions.
>
> Before September 20, 2018, Mr. Coniker had also been informed by the church's Priest that he was not to videotape or take pictures inside the church. Mr. Coniker also knew prior to September 20, 2018, that he was not permitted to "bring the [Holy Communion] host out of [the] church" once he had received it. Mr. Coniker understood that he was to consume the host

- 3 -

immediately if received in his mouth or within two steps if received in his hand. Mr. Coniker was aware that if he did not follow the foregoing practices regarding the host, his disobedience would cause a disturbance at the church.

On [Thursday,] September 20, 2018, Mr. Coniker went to Assumption Church for morning services. Knowing the disturbance it would cause and that he had been forbidden from doing so, Mr. Coniker nevertheless intended that morning to take pictures and to record the goings on in the church. He also, despite his incredible assertions to the contrary, intended to violate the host-practices set forth above by removing the host from the church so that he would have God with him later in the day at a court proceeding in Ohio.

After giving Confession before morning services began, Mr. Coniker took out his camera and started to take pictures and videotape of the church. The Priest again told Mr. Coniker that he was not permitted to do so and—given Mr. Coniker's reaction and his history with the church—called the police.

Mass then began, and Mr. Coniker refused to consume the host after receiving it. That refusal caused the Eucharistic Minister to tell Mr. Coniker that he was required to consume the host. Mr. Coniker told the Eucharistic Minister that he was "going to take th[e] host with [him] to court" later that day.[] The Priest then confronted Mr. Coniker, and Mr. Coniker testified that the following occurred:

> [H]e stopped me. He says, You can't do that. I said, well then, Father, you come to court—with me to court today. I need a true father in my life. My dad was biologically dead at that point and there's falsehoods—I need God the Father. And so [H]e's in this host, so, I'm going to bring God the Father with me in this host to be physically with me. He said, you can't do that. I said—I knew I was committing a spiritual act of disobedience. . . .

> [H]e's telling me I can't do that. He has people surround me. He says, don't let him leave the church.

Accordingly, Mr. Coniker knew he could not leave the church with the host and had been repeatedly told the same, yet he repeatedly refused to listen and repeatedly tried to take the host out of the church without consuming it. The Priest, along with

- 4 -

other parishioners, then attempted to prevent Mr. Coniker from leaving with the host.

After receiving the report of a disturbance at Assumption Church, law enforcement arrived on the scene. Police Chief Matthew Sentner found the Priest and the entire congregation surrounding Mr. Coniker, whose back was up against a wall as he faced about a dozen or so people. After speaking with the Priest, Chief Sentner proceeded to arrest Mr. Coniker for theft of the host. During the arrest, Mr. Coniker was not compliant and, instead, became aggressive with Chief Sentner, who was required to wrestle Mr. Coniker to the ground. [Officer James Dold responded to the church after Mr. Coniker was handcuffed.]

Trial Court Opinion, 3/9/22, at 7–10 (record citations omitted, Chief Sentner's name corrected).

Police charged Coniker in connection with both incidents.[2] On August 18, 2021, the trial court heard both cases in separate non-jury trials. In the Office Case, the trial court found Coniker guilty of harassment of Attorney Herb and of Ms. Knochel, disorderly conduct at the magistrate's office and at Attorney Herb's office, and defiant trespass. In the Church Case, the trial

_____

[2] In the Office Case, police initially charged Coniker with terroristic threats and disorderly conduct, under 18 Pa.C.S.A. §§ 2706(a)(3) and 5503(a)(1). The Commonwealth amended the charges before trial to four counts of harassment, two counts of disorderly conduct, and simple trespass, under 18 Pa.C.S.A. §§ 2709(a)(3), 5503(a)(4), and 3503(b.1)(1)(i).

In the Church Case, police initially charged Coniker with terroristic threats, resisting arrest, harassment, defiant trespass, and theft by unlawful taking, under 18 Pa.C.S.A. §§ 2706(a)(1), 5104, 2709(a)(4), 3503(b)(1)(i), 3921(a), respectively. The theft charge was dismissed at Coniker's preliminary hearing. The Commonwealth amended the charges before trial to disorderly conduct, simple trespass, and two counts of harassment, under 18 Pa.C.S.A. §§ 5503(a)(4), 3503(b.1)(1)(i), and 2709(a)(3).

court found Coniker guilty of harassment of Chief Sentner and of Officer James Dold, as well as disorderly conduct.

The trial court sentenced Coniker to consecutive 90-day periods of probation for an aggregate term of 720 days of probation. Coniker filed timely post-sentence motions, a premature notice of appeal, and an amended post-sentence motion. The trial court ultimately denied Coniker's post-sentence motions, providing: "Mr. Coniker's sentences of probation are terminated, and the Court closes interest in the same." Order, 12/28/21, at 1. Coniker timely appealed. Coniker and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.

This Court consolidated Coniker's cases *sua sponte*. Coniker raises the following challenges in his combined brief for both cases, which we have reordered for ease of disposition:

> Did the Commonwealth provide sufficient evidence to support Mr. Coniker's convictions? More specifically:
>
> a. At [the Office Case], did the Commonwealth fail to produce sufficient evidence to support the Harassment conviction in that it failed to establish that (1) Mr. Coniker had the intent to harass, annoy or alarm anyone, (2) … Mr. Coniker had no legitimate purpose to be at Attorney Herb's office, and (3) … multiple acts supported the "course of conduct" charge?
>
> Further, did the Commonwealth present sufficient evidence to support the conviction for Disorderly Conduct by establishing that Mr. Coniker [(1) had] an intent to cause public inconvenience, (2) had created any hazardous or physically offensive condition, and (3) did not have a legitimate purpose for his actions?
>
> Finally, as to the Criminal Trespass conviction, did the Commonwealth present sufficient evidence that Mr. Coniker (1)

- 6 -

was aware that he could not enter attorney Herb's office, and (2) … had a criminal intent to threaten or terrorize anyone in the office?

b. At [the Church Case], did the Commonwealth fail to produce sufficient evidence to support the Disorderly Conduct charge in that it failed to demonstrate that Mr. Coniker (1) had the specific intent to create a public inconvenience, annoyance, or alarm; (2) … created a hazardous or physically offensive condition by his actions; and (3) … did not have a legitimate purpose for his presence in the church?

Further, was the Harassment conviction supported by sufficient evidence of (1) Mr. Coniker's intent to harass, annoy, or alarm anyone, (2) Mr. Coniker not having a legitimate purpose for his actions, and (3) a "course of conduct," i.e., multiple acts?

Coniker's Brief at 10–11.

## Mootness

Before turning to the substantive issues in this appeal, we note that Coniker has completed his probationary sentence. In denying Coniker's amended post-sentence motions, the trial court ordered that its interest in his sentences was closed. Accordingly, we directed Coniker to show cause why his appeals should not be dismissed as moot. Coniker replied that there is no statutory basis to preclude review of a completed sentence on direct appeal, unlike in a petition for post-conviction collateral relief. *Cf.* 42 Pa.C.S.A. § 9543(a)(1) (limiting eligibility for relief under the Post Conviction Relief Act (PCRA)). Further, he indicates that overturning his convictions would benefit him by preventing collateral consequences that flow from convictions.

A case becomes moot when there is no longer an actual case or controversy to be resolved. *In the Interest of Y.W.-B.*, 265 A.3d 602, 612

- 7 -

n.8 (Pa. 2021); **e.g.**, **Commonwealth v. Beaudoin**, 182 A.3d 1009, 1010 (dismissing appeal as moot based on defendant's death, a discretionary decision by this Court). However, the collateral consequences doctrine recognizes that a person with a criminal conviction may face legal consequences beyond serving the sentence imposed for the conviction. **Commonwealth v. Markley**, 501 A.2d 1137, 1141–42 (Pa. Super. 1985) (citing **Sibron v. New York**, 392 U.S. 40 (1968)).[3] Notably, adverse consequences are presumed; "a criminal case is moot only if it is shown that there is *no* possibility that *any* collateral legal consequences will be imposed on the basis of the challenged conviction." **Id.** at 1141 (quoting **Sibron**, 392 U.S. at 57).

Here, Coniker suggests that his convictions could damage his ability to hold professional licenses, to own a firearm, to obtain public benefits or student loans, and to serve on a jury, as well as increasing his prior record score in future cases. Coniker's Brief at 29.[4] He also speculates that these

_____

[3] **Markley** involved a petition under the former Post Conviction Hearing Act. Section 9543(a)(1) of the PCRA has now superseded **Markley**'s holding about petitions for post-conviction collateral relief. **See Commonwealth v. Pierce**, 579 A.2d 963, 964–65 (Pa. Super. 1990) (rejecting application of the collateral consequences doctrine to a PCRA petition). However, no statute precludes review on direct appeal of a judgment of sentence that has been completed. Moreover, a criminal defendant enjoys a constitutional right to such an appeal. Pa. Const. Art. V, § 9.

[4] These consequences would not flow from Coniker's convictions for summary offenses. **See** 18 Pa.C.S.A. § 9124(b)(3) (prohibiting consideration of summary offenses for professional licensing); **id.** § 6105(b) (listing offenses
*(Footnote Continued Next Page)*

convictions could damage his reputation. *Id.*; *see Markley*, 501 A.2d at 1140, 1141 n.4; *see also* Pa. Const. Art. 1, § 1 (recognizing an inherent right to reputation). The Commonwealth has not challenged mootness. Given the possibility that Coniker's convictions will damage his reputation, we conclude that he could suffer collateral consequences as a result. As such, we agree with Coniker that the collateral consequences doctrine applies and his cases are not moot. *Markey*, *supra*. Therefore, we will address substantive issues.

## Sufficiency of the Evidence

Coniker's claims all challenge the sufficiency of the evidence. Evidence is sufficient if "it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt." *Commonwealth v. Widmer*, 744 A.2d 745 751 (Pa. 2000) (citing *Commonwealth v. Karkaria*, 625 A.2d 1167 (Pa. 1993)). Because sufficiency of the evidence is a question of law, the standard of review is *de novo*, and the scope of review is plenary. *Commonwealth v. Smith*, 234 A.3d 576, 581 (Pa. 2020) (citing *Commonwealth v. Sanchez*, 36 A.3d 24, 37 (Pa. 2011)). A reviewing court views all the evidence from trial in the light most favorable to the Commonwealth as verdict winner, including the benefit

---

that bar a person from owning firearms); 24 P.S. § 5104.1(a) (providing for denial of student loan assistance to students convicted of felonies, certain misdemeanors, and other offenses related to higher education institutions); 42 Pa.C.S.A. § 4502(a)(3) (disqualifying from jury service citizens convicted of crimes punishable by imprisonment for more than one year); 204 Pa. Code § 303.8(g)(1) (excluding summary offenses from a prior record score).

of all reasonable inferences drawn from the evidence. **Widmer**, 744 A.2d at 751 (citing **Commonwealth v. Chambers**, 599 A.2d 630 (Pa. 1991)).

**Office Case – Harassment**

In the Office Case, Coniker first challenges his two convictions for harassment of Attorney Herb and of Ms. Knochel. Coniker argues that the evidence is insufficient to establish that he had the requisite intent or that he engaged in a course of conduct. Coniker's Brief at 51–56, 56–57. The Commonwealth responds that Coniker's actions were reprehensible in light of recent mass shootings and that he engaged in a course of conduct starting with entering the office in the first place. Commonwealth's Brief at 38–39.

Subsection 2709(a)(3) of the Crimes Code defines harassment, charged here, in relevant part: "A person commits the crime of harassment when, with intent to harass, annoy or alarm another, the person . . . engages in a course of conduct or repeatedly commits acts which serve no legitimate purpose . . . ." 18 Pa.C.S.A. § 2709(a)(3). A "course of conduct" is defined in part as "A pattern of actions composed of more than one act over a period of time, however short, evidencing a continuity of conduct. The term includes lewd, lascivious, threatening or obscene words, language, drawings, caricatures or actions, either in person or anonymously." **Id.** § 2709(f).

To sustain harassment convictions, the evidence must show that the defendant had the specific "intent to harass, annoy or alarm another." 18 Pa.C.S.A. § 2709. Such an intent "may be inferred from the totality of the

circumstances." ***Commonwealth v. Cox***, 72 A.3d 719, 721 (Pa. Super. 2013) (quoting ***Commonwealth v. Lutes***, 793 A.2d 949, 961 (Pa. Super. 2002)).

Attorney Herb testified that Coniker told the 911 operator, "I'm at Attorney Herb's office and I got a gun." N.T., 8/18/21, at 4–5. Coniker testified that he told police that he had "non-violent" "weapons of mass construction," ***id.*** at 33–34.[5] However, the trial court as finder of fact was free to believe Attorney Herb's testimony. Although Coniker testified that he was merely trying to notify the government about a perceived wrong, his statements about a gun and weapons support the reasonable inference that he intended to alarm other people, such as Attorney Herb and Ms. Knochel, who were in the office. Therefore, the evidence was sufficient to prove Coniker's intent.

Regarding the course of conduct requirement, we reject Coniker's invitation to consider only an isolated statement from the 911 call in Attorney Herb's office. Although a single act is not a course of conduct, "more than one act over a short period of time" can be. ***Lutes***, 793 A.2d at 961. Coniker made multiple statements that could (and did) alarm the people who heard them. This is sufficient to prove a course of conduct, and we will therefore affirm Coniker's convictions for harassment in the Office Case.

---

[5] The 911 recording was not included in the certified record on appeal.

- 11 -

**Office Case – Disorderly Conduct**

Coniker challenges both disorderly conduct convictions arising from the Office Case, which concern the events at the Magistrate's office and at Attorney Herb's office. Regarding the Magistrate's office, Coniker asserts that there was no testimony about these events. Coniker's Brief at 58. As for Attorney Herb's office, Coniker argues that the evidence did not reflect an intent to cause alarm, did not show that he created a hazardous or physically offensive condition, and did not involve a course of conduct. *Id.* at 58–62.

The Commonwealth responds that Officer Pavlecic and Coniker both testified to the events at the Magistrate's office, which involved threats about a weapon and caused the courtroom to be locked down. Commonwealth's Brief at 36–37. At Attorney Herb's office, the Commonwealth argues that Coniker was at least reckless that he would cause a risk of public inconvenience, annoyance, or alarm, and that he created a hazardous and physically offensive condition without a legitimate purpose by yelling at an attorney's office that he had a gun.

The statute defines the offense: "A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he . . . creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor." 18 Pa.C.S.A. § 5503(a)(4). Section 5503's goal is to protect the public from public unruliness leading to tumult or disorder; it is not a "catchall for every act which annoys or disturbs people." *Commonwealth v. Mauz*, 122 A.3d

- 12 -

1039, 1041 (Pa. Super. 2015) (quoting **Commonwealth v. Maerz**, 879 A.2d 1267, 1269 (Pa. Super. 2005)). We will address the elements in turn.

First, Section 5503 requires proof that the defendant had one of two alternative mental states: "intent to cause public inconvenience, annoyance or alarm, *or* recklessly creating a risk thereof." 18 Pa.C.S.A. § 5503 (emphasis added). The Commonwealth can thus sustain a disorderly conduct conviction with evidence that the defendant recklessly created a risk of public inconvenience, annoyance, or alarm, even if he lacked the intent to do so. **Commonwealth v. Troy**, 832 A.2d 1089, 1094 (Pa. Super. 2003) (citing **Commonwealth v. Kidd**, 442 A.2d 826, 827 (Pa. Super. 1982)).

This Court held an act of protest to be disorderly conduct in **Commonwealth v. Roth**, 531 A.2d 1133 (Pa. Super. 1987). The defendants, informed that they were not welcome to do so, attempted to leave a steel beam on a church altar during Easter Sunday services. **Id.** at 1136. Although they argued that they merely intended to raise awareness, this Court held that the record supported an intent to cause public inconvenience, annoyance, or alarm. **Id.** at 1136–37. The defendants' disregard of the notice that the church did not want them to bring in their steel beam showed their intent.

Second, Section 5503(a)(4) requires proof that a defendant "create[d] a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor." 18 Pa.C.S.A. § 5503(a)(4). Our cases illustrate a patchwork of conditions that are hazardous or physically offensive. A condition is "hazardous" if it "involves danger or risk" of "the possibility of

- 13 -

injuries resulting from public disorders." *Roth*, 531 A.2d at 1137 (citation and internal quotation marks and brackets omitted); *Commonwealth v. Williams*, 574 A.2d 1161, 1164 (Pa. Super. 1990). By contrast, the meaning of "physically offensive condition" "encompasses direct assaults on the physical senses of members of the public" as opposed to "merely morally offensive" conduct. *Commonwealth v. McConnell*, 244 A.3d 44, 49 (Pa. Super. 2020). The Commonwealth needs to prove that the defendant created either a hazardous condition or a physically offensive condition, not both. *See id.* at 49 n.3.

For example, this Court found the defendants in *Roth* created a hazardous condition by disrupting Easter Sunday services with a symbolic act of protest. *Roth*, 531 A.2d at 1137. Noting the "emotionally charged atmosphere," we reasoned that the protestors' approach could have caused altercations with the church members. *Id.* We reached the same conclusion in another case, where a witness acted irrationally in a protection from abuse proceeding. *Commonwealth v. Love*, 896 A.2d 1276 (Pa. Super. 2006). There, after the trial court ruled against the defendant, the witness jumped from his seat and yelled, struggling against the deputy sheriff who then removed him from the crowded courtroom. *Commonwealth v. Love*, 896 A.2d 1276, 1279 (Pa. Super. 2006). We held that heightening the tension of a court proceeding was sufficient to prove a hazardous condition. *Id.* at 1286. Further, the defendant created a risk by confronting the deputy sheriff who was escorting him from the courtroom. *Id.*

Here, the trial evidence included Officer Pavlecic's testimony that police were dispatched to the Magistrate's office for a 911 report of a male "making threats with a weapon." N.T., 8/18/21, at 14–15. After locking down the courtroom, they proceeded to Attorney Herb's office to find Coniker "berating" Attorney Herb. This was the basis for both disorderly conduct convictions in the Office Case.

As noted above, the Commonwealth can sustain its convictions for disorderly conduct with evidence that Coniker had the specific intent to cause public inconvenience, annoyance, or alarm, *or* that he recklessly created "a risk thereof." *Troy*, 832 A.2d at 1094. We have little difficulty concluding that making statements about having weapons (even "non-violent" weapons) in a courtroom and an attorney's office evinces at least recklessness about creating a risk of public inconvenience, annoyance, or alarm. Furthermore, such a statement can cause a "hazardous" condition, one that "involves danger or risk" of "the possibility of injuries resulting from public disorders." *Roth*, *supra*; *Williams*, *supra*. Here, the police locked down the courtroom, and Attorney Herb's assistant, Ms. Knochel, retreated out a back exit. The court could infer that this increased the risk of injury to people at the Magistrate's office or in the back of Attorney Herb's office.

With respect to the "course of conduct" requirement, our Court has explained an analogous provision in the former stalking statute to encompass at least two "related but separate" acts. *Commonwealth v. Leach*, 729 A.2d 608, 611 (Pa. Super. 1999); *see* 18 Pa.C.S.A. § 2709(f) (defining "course of

- 15 -

conduct"). Although the elements are not established until a second act occurs, each act constitutes a separate completed offense. *Id.* at 612. Here, Coniker's statements at the Magistrate's office and at Attorney Herb's office separately created hazardous conditions, each being sufficient to prove disorderly conduct. Therefore, we affirm Coniker's convictions for disorderly conduct in the Office Case.

**Office Case – Criminal Trespass**

Coniker next challenges his conviction for criminal trespass/simple trespasser in the Office Case. The statute provides: "A person commits an offense if, knowing that he is not licensed or privileged to do so, he enters or remains in any place for the purpose of . . . threatening or terrorizing the owner or occupant of the premises . . . ." 18 Pa.C.S.A. § 3503(b.1)(1)(i).

Coniker argues that there was no testimony to establish that he *knew* that he was not permitted in Attorney Herb's office, and that Attorney Herb even testified that Coniker did not make specific threats to him or his staff. Coniker's Brief at 62–65. Coniker also points to two statutory affirmative defenses, which he indicates went unrebutted at trial:

It is a defense to prosecution under this section that:

\* \* \*

(2) the premises were at the time open to members of the public and the actor complied with all lawful conditions imposed on access to or remaining in the premises; or

(3) the actor reasonably believed that the owner of the premises, or other person empowered to license access thereto, would have licensed him to enter or remain.

18 Pa.C.S.A. § 3503(c)(2), (3).

The Commonwealth responds that by his own testimony, Coniker acknowledged that Attorney Herb had previously told him never to come into his office again, which was never revoked. Commonwealth's Brief at 29–33. Further, the Commonwealth indicates that Coniker's statements to the 911 operator reflect his intent to terrorize people. *Id.* at 26–29.

To violate this section, a defendant must know that he is not licensed or privileged to enter or remain in a place. 18 Pa.C.S.A. § 3503(b.1); *see Commonwealth v. Namack*, 663 A.2d 191, 194 (Pa. Super. 1995) (defiant trespass, Section 3503(b)(1)). If the Commonwealth does not rebut a defendant's good faith, reasonable mistake of fact that he was permitted to be on property, then the evidence is insufficient to prove that the defendant knew he was not licensed or privileged to be there. *Id.* at 194–95.

Here, Coniker testified that Attorney Herb had previously told him not to come into his office:

> James Herb got mad at me at Allegheny County Court because he was in the process of railroading me into mental health court. After I observed all of the information and it came down to the point to make a final addition, I decided not to. So, he got mad at me and he said, never come into my office or I'm going to have you arrested. I said, could you give that to me in writing? He said, no. So, that's the only time that that's happened.

N.T., 8/18/21, at 28. Based on this unambiguous statement from Attorney Herb, we conclude that the trial court properly determined that Coniker's belief that he could enter the office was not a good faith, reasonable mistake of fact.

The statute also requires the Commonwealth to prove that Coniker entered or remained in Attorney Herb's office "for the purpose of . . . threatening or terrorizing the owner or occupant of the premises." 18 Pa.C.S.A. § 3503(b.1)(1)(i). In describing "intent to terrorize" language in the terroristic threats statute, we have recognized that this language protects against "the psychological distress that follows from an invasion of another's sense of personal security." **Commonwealth v. Kline**, 201 A.3d 1288, 1291 (Pa. Super. 2019) (quoting **In re B.R.**, 732 A.2d 633, 636 (Pa. Super. 1999)).

Here, although Coniker's statements were not threats made directly to Attorney Herb or his staff, they could cause the sort of psychological distress that flows from invading their sense of personal security—the stress that comes from the possibility that a person has entered a law office with a gun. Therefore, the evidence was sufficient to prove that Coniker entered Attorney Herb's office with the purpose of terrorizing the people inside.

As to the affirmative defenses in Section 3503(c), Coniker did not argue their applicability before the trial court. By not doing so, he has waived their applicability. **Commonwealth v. Wanner**, 158 A.3d 714, 717 (Pa. Super. 2017). We will therefore affirm Coniker's conviction for criminal trespass/simple trespasser in the Office Case.

### Church Case – Harassment

The trial court convicted Coniker of harassment of Chief Sentner (who first reported to the church and arrested Coniker) and of Officer Dold (who

responded to the church after Coniker was handcuffed). Coniker disputes the sufficiency of the evidence to prove both that he intended to harass, annoy, or alarm others and that he engaged in a course of conduct or repeatedly committed acts that served no legitimate purpose. Coniker's Brief at 32–42.

Coniker likens his case to three prior cases in which this Court held the evidence to be insufficient to prove harassment. First, in **Commonwealth v. Wheaton**, 598 A.2d 1017 (Pa. Super. 1991), a defendant homeowner confronted two excavators working on a nearby water line and two trustees of the water association that served his home, warning that he would sue them or have them arrested. **Id.** at 1018. This Court reasoned that he had a legitimate purpose in maintaining water services to his home. **Id.** at 1020. "[T]he import of [requiring 'no legitimate purpose'] is broadly to exclude from this subsection any conduct that directly furthers some legitimate desire or objective of the actor. This element of the residual offense should limit its application to unarguably reprehensible instances of intentional imposition on another." **Id.** at 1019 (quoting Model Penal Code § 250.4 cmt. 5 (Am. Law Inst. 1980)). Further, because the defendant intended to maintain water services, his complaining did not support an intention to harass, annoy, or alarm the people whom he thought could shut off his water. **Id.**

Second, in **Commonwealth v. Bender**, 375 A.2d 354 (Pa. Super. 1977), two police officers privately charged a defendant with harassment after he complained about how they handled his gun permit application. This Court held that the evidence was insufficient to show that the defendant's

"ostensibly lawful and constitutionally protected" acts served "no legitimate purpose." *Id.* at 358–59. Additionally, the Court determined that the evidence did not establish that the defendant's acts would "seriously offend the average person" to alarm or seriously annoy the officers. *Id.* at 359 (citing *Commonwealth v. Duncan*, 363 A.2d 803 (Pa. Super. 1976)).

Coniker stresses that this Court in *Bender* required the officers to have thicker skin:

> [The officers testified to reputational and health damages.] However, we cannot say that appellant's apparently baseless complaints would so seriously offend an average police officer as to result in such illness. Indeed, police officers must expect, as part of their jobs exposing them to daily contact with distraught individuals in emotionally charged situations, to confront and answer accusations of rudeness and improper conduct.

*Id.* at 359–60 (footnote and citations omitted).

Third, in *Commonwealth v. Battaglia*, 725 A.2d 192 (Pa. Super. 1999), a defendant landscaper was arrested after refusing to clean up leaves and saying he would sue the police for bothering him. *Id.* at 193. At the police station, he touched the officer's hand while grabbing a pen. *Id.* On appeal, this Court held that none of the defendant's actions supported the inference that he intended to harass the officer: his threat to sue was "responsive, not provocative," his snatching the pen and refusing to rake also lacked proof of intent to harass. *Id.* at 194–95.

Coniker argues that his behavior with the Communion host did not show an intent to harass, annoy, or alarm, similar to the defendants' behavior in *Wheaton* and *Battaglia*. He emphasizes that his purpose in being at church

was legitimate. Finally, he disputes that he engaged in a "course of conduct" as required for harassment under subsection 2709(a)(3).

The Commonwealth responds that "a course of conduct can be based on words alone, and that intent to harass may be inferred from the totality of the circumstances." Commonwealth's Brief at 20 (quoting *In re M.J.M.*, 858 A.2d 1259, 1263 (Pa. Super. 2004)). It details Coniker's interactions with Chief Sentner: Coniker refused to give the consecrated host to Chief Sentner, "assumed a defiant posture and forced the Chief to reach into his pocket to retrieve the host," resisted Chief Sentner's attempts to remove him from the church, and complained about other grievances with the church and with Chief Sentner once he was arrested. *Id.* at 20–23. The Commonwealth concludes that Coniker could have avoided the whole situation by simply consuming or surrendering the host. *Id.* at 23.

In analyzing the sufficiency of the evidence for harassment of Chief Sentner, we first note that the *Wheaton*, *Bender*, and *Battaglia* cases were decided under prior versions of the harassment statute, which required the Commonwealth to prove that a defendant, with intent to harass, annoy, or alarm another person, "engage[d] in a course of conduct or repeatedly commit[ted] acts which alarm or seriously annoy such other person and which serve no legitimate purpose." *Bender*, 375 A.2d at 357 (quoting 18 Pa.C.S. § 2709(3) (amended)[6]). Presently, subsection 2709(a)(3) does not require

_____

[6] Act No. 1999-59 (S.B. No. 167), effective Feb. 13, 2000, removed the "which alarm or seriously annoy such other person" phrase.

the Commonwealth to prove that the victim was contacted, let alone alarmed or seriously annoyed. **Commonwealth v. Collins**, 2022 PA Super 195, ___ A.3d ____, 2022 WL 17073286, at *4–5 (Pa. Super. Nov. 18, 2022). Therefore, the Commonwealth was not required to prove that Coniker's actions **actually** offended Chief Sentner. As such, **Bender**'s discussion of a police officer's ability to be alarmed or annoyed is not relevant to the elements of the present version of Section 2709(a)(3).

This leaves the two disputed elements: whether Coniker intended to harass, annoy, or alarm another[7] and whether he engaged in a course of conduct or repeatedly committed acts that served no legitimate purpose. To prove specific intent to harass, annoy, or alarm another, the Commonwealth must show that it was Coniker's "conscious object to engage in conduct of that nature or to cause such a result." 18 Pa.C.S.A. § 302(b)(1)(i). Such an intent "may be inferred from the totality of the circumstances." **Cox**, **supra**.

We find the evidence to be insufficient to prove Coniker's intent. As in **Battaglia**, Coniker's actions while Chief Sentner questioned and arrested him were "responsive, not provocative." While Coniker's refusal to surrender the consecrated host could reflect any number of intentions, it is not clear how it

---

[7] The Commonwealth explained that Chief Sentner was the victim for this count. For *mens rea* purposes, nothing in the statute requires the named victim to be the person the defendant intended to harass, annoy, or alarm. Nevertheless, it is logical to consider Coniker's actions related to Chief Sentner in determining whether he had the requisite intent. The Commonwealth did not name the priest or members of the congregation as victims at trial.

would reflect an intent to harass.[8]  And although Coniker's repeatedly asking Chief Sentner why he didn't respond to his meeting request was undoubtedly annoying, nothing supports the inference that Coniker had the conscious object to cause this result; like the homeowner in **Wheaton**, Coniker was seeking redress from an authority figure for a perceived wrong.

Therefore, we reverse Coniker's conviction in the Church Case for harassment of Chief Sentner.  As the Commonwealth concedes that the evidence is insufficient to prove the charge of harassment against Officer Dold, Commonwealth's Brief at 24, we will also reverse Coniker's conviction in the Church Case for harassment of Officer Dold.

### Church Case – Disorderly Conduct

We next address the sufficiency of the evidence for Coniker's conviction of disorderly conduct in the Church Case.  This relates to his decision during Holy Communion to remove the host from his mouth and keep it despite the admonitions of the eucharistic minister and the priest.[9]  Coniker emphasizes that he did not physically act out or fight back when he removed and retained the host, characterizing his actions as only "morally offensive to some." Coniker's Brief at 45.  The Commonwealth responds that Coniker created a

_____

[8] It is telling that the charge for which Chief Sentner arrested Coniker—theft of the host from the sanctuary—was dismissed at the preliminary hearing.

[9] Although the actions analyzed herein occurred during a Mass in a Catholic church, there is no religious dispute so intertwined as to prevent resolution of this issue based on neutral legal principles.  **Connor v. Archdiocese of Phila.**, 975 A.2d 1084 (Pa. 2009); **see Jones v. Wolf**, 443 U.S. 595 (1979).

hazardous or physically offensive condition by disrupting Mass and forcing the priest to summon the congregation to surround him. Commonwealth's Brief at 11–18.

As above, the Commonwealth can sustain its conviction for disorderly conduct with evidence that Coniker either had "intent to cause public inconvenience, annoyance or alarm" or "recklessly create[ed] a risk thereof" and that he "create[d] a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor." 18 Pa.C.S.A. § 5503(a)(4).

Here, the record supports the inference that Coniker was reckless that his conduct would create a risk of public inconvenience, annoyance, or alarm. Coniker's testimony demonstrates that he understood the significance of removing the consecrated host from his mouth and the alarm that it would cause. N.T., Trial, 8/18/21, at 30, 35. He refused to return it despite commands from the eucharistic minister and the priest. Under these facts, it is reasonable to infer that Coniker was reckless as to the risk of his actions.

Likewise, the evidence was sufficient to prove that Coniker created a hazardous condition. In church, receiving Communion during morning Mass, Coniker removed the host from his mouth, aware of the grave nature of doing so. He then refused the directives of the priest and eucharistic minister to consume or surrender the host. Instead, he held onto the host, causing the worshipers to surround him and summon the police. The setting is akin to the emotionally charged atmosphere of the church in **Roth** and the courtroom in

*Love*. Coniker caused and then escalated a tense situation, where a group of people closed in on him, creating the risk that someone would be injured. Therefore, the evidence was sufficient to prove that Coniker caused a hazardous condition.

Coniker also disputes that he had "no legitimate purpose" for his actions, characterizing his actions as a private decision made in search of spiritual guidance. Coniker's Brief at 49. A legitimate purpose refers to "conduct which is lawful and constitutionally protected." *Roth*, 531 A.2d at 1137 (citing *Duncan*, 363 A.2d at 808). Coniker does not argue how his decision to accept the host and then remove it—while believing such to be grounds for excommunication—is legitimate. Rather, Coniker's disruptive actions caused the priest to direct the other people in church to surround him to prevent the host from being removed from the church. Because the evidence supports that Coniker had no legitimate purpose, it is sufficient to prove disorderly conduct in the Church Case. Having found the evidence sufficient to prove every element of disorderly conduct, we affirm this conviction.

## Conclusion

We hold that under the collateral consequences doctrine, Coniker's direct appeal from his judgment of sentence is not moot. Because Coniker's convictions for summary offenses could damage his reputation, there is a present case or controversy to resolve in this appeal. We therefore address Coniker's challenges to the sufficiency of the evidence as described above.

In the Office Case, CP-02-CR-0006879-2018, No. 24 WDA 2022: Judgments of sentence affirmed.

In the Church Case, CP-02-CR-0014079-2018, No. 23 WDA 2022: Judgment of sentence affirmed at Count 1, disorderly conduct. Judgments of sentence vacated and convictions reversed at Count 3, harassment and at Count 4, harassment.

Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/15/2023