J-A22022-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
LISA MARIE DARRAH :
:
Appellant : No. 1277 WDA 2023

Appeal from the Judgment of Sentence Entered September 21, 2023
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0004200-2022

BEFORE: MURRAY, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY McLAUGHLIN, J.: **FILED: January 30, 2025**

Lisa Marie Darrah appeals from the judgment of sentence entered following her convictions for terroristic threats and disorderly conduct.[1] She challenges the sufficiency of the evidence. We affirm in part and reverse in part.

The evidence at Darrah's bench trial was as follows. Sergeant Darren Mikus testified that he arrived at Darrah's home on March 24, 2022, around 5:30 p.m. to respond to a "verbal domestic" call. N.T., Trial, 8/14/23, at 18. There, Darrah told him that she wanted her son arrested. He described Darrah as "very upset" and "irate," and said that she was threatening her son and father. *Id.* Sergeant Mikus said he believed that Darrah was experiencing withdrawal from an unspecified substance. *Id.* After advising Darrah's father

---

[1] 18 Pa.C.S.A. §§ 2706(a)(1) and 5503(a)(4), respectively.

to contact Darrah's social worker, Sergeant Mikus left. He returned to Darrah's home for another "verbal domestic" call later the same day, around 7:00 or 7:30 p.m. *Id.* at 20. Emergency medical technicians ("EMTs") and an ambulance were at the scene. *Id.* at 25. The EMTs gave a sedative to Darrah to help them get her onto a stretcher, take her out of the house, and put her in an ambulance to be taken for an involuntary commitment. *Id.* at 20, 25.

On her way to the ambulance, Darrah looked at her neighbor's house and yelled, "[T]he whore, the whore, the whore next door." *Id.* at 20. Sergeant Mikus testified that Darrah called her neighbor "different names" and "point[ed] in [their] direction, like looking at the house saying bad names, [c]-u-n-t, whore, things like that." *Id.* Darrah threatened to burn her neighbor's house down, saying, "[W]hen I get back I'm going to kill you. I'm going to burn your house down. I fucking hate you." *Id.* at 22. The distance between Darrah's home and the neighbor's home was about 60 feet. *Id.* at 26. Sergeant Mikus testified that Darrah was yelling very loudly. *Id.* at 28. Sergeant Mikus said it took "thirty seconds, a minute[,] [u]nder a minute" to remove Darrah from her house and place her in the ambulance. *Id.* at 26. Darrah's neighbor, Kelly Keller, told the sergeant that she heard what Darrah had said and that she wanted to press charges. *Id.* at 21.

Keller testified that on the day of the incident, she heard Darrah say, "I'm going to kill the fucking bitch and burn her house down." *Id.* at 31-32. She also heard Darrah being asked whom she was talking to, and Darrah responded, "[T]he fucking bitch next door, Kelly." *Id.* at 32. Keller stated that

- 2 -

while Darrah was yelling outside, Keller's neighbors were texting her and "telling me to make sure I went out and told the police what [Darrah] was saying[.]" *Id.* at 33. She testified that her neighbors "were concerned for my safety and I was concerned for my safety as well as my family." *Id.* Keller also explained that she had a "no contact order" against Darrah due to "[Darrah's] previous harassment towards myself and my daughter." *Id.* at 32-33.

The court found both witnesses credible. It rendered verdicts of guilty for terroristic threats and disorderly conduct. The court sentenced Darrah to concurrent terms of reporting probation, one year for disorderly conduct and five years for terroristic threats. This timely appeal followed.

Darrah raises the following issues:

I. Was the evidence [] insufficient to sustain the conviction at Count 8 – Disorderly Conduct because the Commonwealth did not prove, beyond a reasonable doubt, that Ms. Darrah created a hazardous or physically offensive condition?

II. Was the evidence [] insufficient to sustain the disorderly conduct conviction as a third-degree misdemeanor as the Commonwealth failed to prove that Ms. Darrah intended to cause substantial harm or serious inconvenience or that she persisted after reasonable warning to desist?

III. Was the evidence [] insufficient to sustain the conviction at Count 3 – terroristic threats because the Commonwealth did not prove, beyond a reasonable doubt, that Ms. Darrah intended to ter[r]orize Keller?

Darrah's Br. at 5 (suggested answers omitted).

Each of Darrah's issues challenges the sufficiency of the evidence. "A claim challenging the sufficiency of the evidence is a question of law." *Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000). When reviewing such a challenge, we must "determine whether, when viewed in the light most favorable to the verdict winner, the evidence at trial and all reasonable inferences therefrom [were] sufficient for the trier of fact to find that each element of the crime charged is established beyond a reasonable doubt." *Commonwealth v. Dix*, 207 A.3d 383, 390 (Pa.Super. 2019). The Commonwealth may sustain its burden with wholly circumstantial evidence. *See id.*

Darrah argues that there was insufficient evidence to support her conviction for disorderly conduct under the subsection under which she was charged, Section 5503(a)(4). She alleges that her conduct "did not lead to tumult [and] disorder" and was "neither hazardous [n]or physically offensive." Darrah's Br. at 15 (quoting *Commonwealth v. Hock*, 728 A.2d 943, 946 (Pa.Super. 1999), and 18 Pa.C.S.A. § 5503(a)(4)) (internal quotation marks omitted). She asserts that she did not create a hazardous condition because her actions "did not create a risk of 'injuries resulting from public [disorder].'" *Id.* at 16 (quoting *Commonwealth v. Fisher*, 303 A.3d 1078, 1083 (Pa.Super. 2003)). While she admits that she "allegedly" said she would kill Keller when she got back, Darrah asserts that "the surrounding circumstances showed that she was experiencing a mental-health crisis and being taken to a hospital for involuntary commitment." *Id.* at 17-18. Darrah points out that

- 4 -

she was "in a stretcher, sedated and under the care of numerous professionals" and that the encounter lasted less than a minute. *Id.* at 13, 18. She contends that while her words might have been morally offensive, they did not create a physically offensive condition.

The court found Darrah guilty under Section 5503(a)(4), which requires evidence that Darrah "create[d] a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor." 18 Pa.C.S.A. § 5503(a)(4). To sustain the conviction, the Commonwealth had to prove that Darrah "created either a hazardous condition or a physically offensive condition, not both." *Commonwealth v. Coniker*, 290 A.3d 725, 735 (Pa.Super. 2023). The goal of the disorderly conduct statute is "to protect the public" but it "is not intended as a catchall for every act which annoys or disturbs people[.]" *Commonwealth v. Mauz*, 122 A.3d 1039, 1041 (Pa.Super. 2015). "The cardinal feature of the crime of disorderly conduct is public unruliness which can or does lead to tumult and disorder." *Hock*, 728 A.2d at 946 (citation omitted).

A condition is hazardous where "it involves danger or risk of the possibility of injuries resulting from public disorders." *Coniker*, 290 A.3d at 735 (cleaned up). A physically offensive condition occurs when there is a direct assault "on the physical senses of members of the public[.]" *Id.* (quoting *Commonwealth v. McConnell*, 244 A.3d 44, 49 (Pa.Super. 2020)). "A defendant may create such a condition if she sets off a 'stink bomb', strews rotting garbage in public places, or shines blinding lights in the eyes of others."

*Commonwealth v. Williams*, 574 A.2d 1161, 1164 (Pa.Super. 1990) (citation omitted). A physically offensive condition may also occur where "a defendant invades the physical privacy of another person." *Id.*; *see Commonwealth v. Young*, 535 A.2d 1141, 1142-43 (Pa.Super. 1988) (concluding appellant, who was a male, created physically offensive condition by entering the stall in a female bathroom where a woman was in the stall). However, "[c]onduct that is merely morally offensive but does not affect the physical senses of another does not rise to the level of disorderly conduct." *McConnell*, 244 A.3d at 49; *see Commonwealth v. N.M.C.*, 172 A.3d 1146, 1152 (Pa.Super. 2017) (concluding evidence was insufficient for disorderly conduct; defendant's sharing of a video recording of students fighting might have been morally offensive but was not "as physically offensive as set[ting] off a stink bomb, strew[ing] rotten garbage in public places, or shin[ing] blinding lights in the eyes of others") (internal quotation marks, emphasis, and citation omitted) (alteration in original).

Viewing the evidence in the light most favorable to the Commonwealth, the evidence failed to establish that Darrah created a hazardous or physically offensive condition. The record does not reflect that Darrah's conduct involved danger or a risk of injuries from a public disorder. *Coniker*, 290 A.3d at 735. Notably, when Darrah was yelling at and threatening her neighbor, Darrah was on a stretcher, under sedation, and being wheeled to the ambulance so she could be taken for an involuntary commitment. The entire episode lasted only 30 seconds to a minute. Furthermore, the evidence failed to show that

Darrah's conduct directly assaulted the physical senses of members of the public. *Id.* While the record shows that Keller's neighbors were concerned about Darrah's behavior and began texting Keller to contact the police, the record does not reflect that Darrah invaded Keller or her other neighbors' physical privacy, much less that she created a physically offensive condition. *See Williams*, 574 A.2d at 1164; *Mauz*, 122 A.3d at 1043 (concluding evidence was insufficient to prove disorderly conduct where appellant made brief offensive remarks about neighbor while standing at his neighbor's fence; appellant returned to his home after making remarks, and appellant did not invade neighbor's physical privacy).

Mindful that "[t]he cardinal feature of the crime of disorderly conduct is public unruliness which can or does lead to tumult and disorder," we reverse the disorderly conduct conviction. *Hock*, 728 A.2d at 946 (citation omitted). Darrah's behavior may have been morally offensive, but we cannot say that it rose to the level of creating a hazardous or physically offensive condition as required under Section 5503(a)(4). *See Williams*, 574 A.2d at 1165 (concluding appellant did not create physically offensive condition where appellant was seen by neighbor in residential parking lot in a t-shirt and underwear and noting that "the idea of wearing underwear in public may be morally offensive" but "is no more *physically* offensive than the sight of a person dressed in other eccentric costumes") (emphasis in original); *But see McConnell*, 244 A.3d at 50-51 (finding sufficient evidence that appellant created a physically offensive condition where appellant shined "eight

construction-grade floodlights towards his neighbors," police received several complaints from neighbors in the area, and appellant left lights on for approximately two hours); *Commonwealth v. Troy*, 832 A.2d 1089, 1093 (Pa.Super. 2003) (finding evidence sufficient where appellant sent "a package of wet, leaky garbage through the mail," which could have affected persons in the public areas of the post office); *Commonwealth v. Roth*, 531 A.2d 1133, 1137-38 (Pa.Super. 1987) (finding evidence sufficient where appellant and more than 20 individuals tried to enter a church "in which they were adamantly unwelcome" creating "a dangerous situation in which altercations between the demonstrators and Church members could have occurred").

Since we conclude that Darrah's first claim has merit, we do not address her second claim regarding the grading of the offense.

In her final issue, Darrah claims that the evidence was insufficient to sustain her conviction for terroristic threats. She argues that the Commonwealth did not show that her remarks "seriously impair[ed] personal security or public inconvenience." Darrah's Br. at 35 (quoting 18 Pa.C.S.A. § 2706, comment). Darrah maintains that her comments were "mere spur-of-the-moment threats" and alleges that "Keller could not have credibly thought that her security was seriously impaired." *Id.* at 35, 36. She claims that she did not intend to terrorize Keller but instead "was merely running her mouth during a mental-health crisis" and "merely expressed transitory anger." *Id.* at 36, 38. Darrah relies on *Commonwealth v. Kidd*, 442 A.2d 826 (Pa.Super.

1982), and *Commonwealth v. Sullivan*, 409 A.2d 888 (Pa.Super. 1979), in support of her claim.

The crime of terroristic threats occurs when "[a] person communicates, either directly or indirectly, a threat to . . . commit any crime of violence with intent terrorize another[.]" 18 Pa.C.S.A. § 2706(a)(1). Thus, "the Commonwealth must prove that the defendant 1) made a threat to commit a crime of violence and 2) the threat was communicated with the intent to terrorize another." *Commonwealth v. Campbell*, 253 A.3d 346, 348 (Pa.Super. 2021). A person's "present ability to inflict harm is not required as an element of this offense." *Kidd*, 442 A.2d at 827. Additionally, the belief of the threatened person that the threat will be carried out is not an element of the crime. *See Commonwealth v. Reynolds*, 835 A.2d 720, 730 (Pa.Super. 2003).

"The purpose of th[is] section is to impose criminal liability on persons who make threats which seriously impair personal security or public convenience. It is not intended by this section to penalize mere spur-of-the-moment threats which result from anger." 18 Pa.C.S.A. § 2706, comment. "However, being angry does not render a person incapable of forming the intent to terrorize." *Reynolds*, 835 A.2d at 730 (cleaned up). We "must consider the totality of circumstances to determine whether the threat was a result of a heated verbal exchange or confrontation." *Id.* (citation omitted).

Viewing the evidence in the light most favorable to the Commonwealth as verdict winner, we conclude that the evidence sufficiently established the

crime of terroristic threats. Darrah threatened to kill Keller and burn her house down. Furthermore, Keller's subjective belief of that Darrah would or would not carry out her threat, and Darrah's present ability to inflict harm, are not elements. *Reynolds*, 835 A.2d at 730; *Kidd*, 442 A.2d at 827. While Darrah contends that like the appellants in *Kidd* and *Sullivan*, she too expressed transitory anger, being angry did not render her incapable of forming the intent to terrorize. *Reynolds*, 835 A.2d at 730.

In *Kidd*, after being arrested for public intoxication, the appellant "told the police he was going to kill them, machine gun them, if given a chance." 442 A.2d at 827. In *Sullivan*, the appellant called the state police and asked that a state police officer be sent to his home due to the appellant's father being assaulted by a county sheriff. Before an officer arrived, the appellant called the state police again and said, "If you don't want to send anybody down here, I have a .30-30 rifle and I'll come up there and blow that son of bitch's head off." *Sullivan*, 409 A.2d at 888-89. The following day, the appellant and the county sheriff ran into each other and a "loud shouting match ensued." *Id.* at 889. During this encounter, the appellant threatened to kill the sheriff. *Id.*

In both *Kidd* and *Sullivan*, this Court found insufficient evidence to prove terroristic threats. In *Kidd*, we determined that the evidence showed that Kidd's action "expressed transitory anger rather than a settled purpose to carry out the threat or to terrorize the other person." 442 A.2d at 827. We also pointed out that Kidd "was obviously inebriated and in an agitated and

angry state of mind." *Id.* (noting emergency room personnel testified and "interpreted [Kidd's] emotional state as one of anger"). In *Sullivan*, we determined that the evidence failed to show that Sullivan "had any intention of carrying out the threat" and that he made the threat in "an agitated and angry state of mind." 409 A.2d at 888, 889 (noting trooper testimony that "[Sullivan] had been very angry").

Looking at the totality of the circumstances, unlike the appellants' actions in *Kidd* and *Sullivan*, Darrah's comments were not the result of a heated verbal exchange or confrontation with her neighbor.

We reverse Darrah's disorderly conduct conviction and affirm in all other respects. We do not remand for resentencing because the court's sentencing scheme - concurrent probationary sentences of one year for disorderly conduct and five years for terroristic threats – has not been upset. *See Commonwealth v. James*, 297 A.3d 755, 770 (Pa.Super. 2023).

Judgment of sentence affirmed in part and reversed in part.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

1/30/2025